STROUD, Judge.
 

 *529
 
 Respondent-mother appeals from a "Review Order" granting sole legal and physical custody of her daughter "April"
 
 [1]
 
 to April's maternal aunt ("intervenor") and scheduling a permanency planning hearing in accordance with N.C. Gen.Stat. § 7B-906.1(a) (2015). We affirm.
 

 April was born out of wedlock to respondent-mother and respondent-father in November 2011. Respondent-father has a history of involvement with Buncombe County Department of Social Services ("DSS") stemming from his substance abuse and reports of sexual abuse involving his three older daughters, who are April's half-sisters. Respondent-father's three daughters had been adjudicated neglected in 2003 and were in the custody of their paternal grandmother at the time of April's birth.
 

 On 2 May 2012, DSS received a child protective services ("CPS") report regarding April and her half-sisters. An investigation revealed that respondent-father, respondent-mother, and April had moved into the home of the paternal grandmother in violation of a court order prohibiting unsupervised contact between respondent-father and his three older daughters.
 

 Rather than obtain a separate residence from respondent-father, respondent-mother agreed to place five-month-old April in kinship care with intervenor on 4 May 2012. DSS did not seek nonsecure custody of the child but filed a petition alleging she was a neglected juvenile on 24 August 2012. The petition summarized respondent-father's CPS history and alleged that the paternal grandmother had revealed respondent-father was bathing with April "all the time" in her home. The paternal grandmother also acknowledged that two of April's half-sisters had previously disclosed sexual abuse by respondent-father after bathing with him.
 

 Respondent-mother gave birth to April's sister "Megan"
 
 [2]
 
 in October 2012. Megan immediately joined her sister in a kinship placement with intervenor.
 

 The trial court adjudicated April a neglected juvenile in March 2013. At disposition, the court found that respondent-father was incarcerated for violating probation and had "abused drugs while living in the home with respondent mother." The court maintained respondents' legal custody of April but concluded that she should remain in her placement
 
 *530
 
 with intervenor. The court concluded that respondent-mother "is capable of providing proper care and supervision for [April] in a safe home when the respondent father is not in the home." It ordered that respondent-mother have one hour per week of supervised visitation with April and authorized additional supervised or unsupervised visitation for respondent-mother at the discretion of the Child and Family Team "so long as respondent father is not in the home." The court subsequently established a permanent plan for April of "prevention of out of home placement."
 

 At a review hearing on 6 November 2013, and by written order entered 24 January 2014, the trial court granted sole legal and physical custody of April to respondent-mother. Though noting that respondent-mother "has not taken advantage of [her] opportunity to visit with [April,]" the court found she was residing with April's maternal grandfather, had full-time employment, and was scheduled to begin parenting classes. Respondent-mother had also obtained a domestic violence protective order against respondent-father. Because "[t]he conditions that led to the involvement of [DSS] have been addressed[,]" the court concluded that "the respondent mother is willing and able to provide adequate care [of April] in a safe environment[.]" Respondent-mother was ordered
 
 *732
 
 to complete a parenting class and "engage in mental health counseling with [April] and follow all treatment recommendations." The court granted respondent-father one hour of visitation per week at the Family Visitation Center. The court waived further review hearings and relieved DSS of its responsibilities in the case but retained jurisdiction pursuant to N.C. Gen.Stat. § 7B-201 (2013).
 

 Despite receiving sole legal and physical custody of April in November 2013, respondent-mother left the child in intervenor's care. On 29 October 2014, respondent-father filed a motion in the cause to enforce his visitation rights as established by the 24 January 2014 review order. The trial court entered an order on 11 December 2014, reopening the case and setting respondent-father's motion for hearing the week of 9 February 2015.
 

 On 19 December 2014, respondent-mother and her boyfriend ("Mr. C.") drove to April's daycare, presented a copy of the 24 January 2014 review order, and removed April. The daycare staff contacted intervenor, who asked respondent-mother to bring April home. Respondent-mother refused and informed intervenor that she also intended to take custody of Megan. Intervenor agreed to meet respondent-mother at the Madison County Sheriff's Department the following day to surrender Megan.
 

 *531
 
 When intervenor arrived at the sheriff's office with Megan, respondent-mother had been jailed on an outstanding warrant for nonpayment of child support owed to intervenor. Respondent-mother refused to allow April and Megan to return to intervenor's care and directed that they be given to their maternal grandmother. Respondent-mother was released from jail later that day when Mr. C. paid her outstanding child support balance of $2,675.55.
 

 On 22 December 2014, intervenor filed a complaint in the District Court in Madison County seeking immediate, temporary, and permanent custody of April and Megan. The court entered an
 
 ex parte
 
 order granting immediate custody to intervenor on 22 December 2014. At a hearing on 2 January 2015, however, the court determined that it lacked jurisdiction over April in light of the pending proceedings in Buncombe County. The court granted intervenor temporary legal and physical custody of Megan, finding that respondent-mother and respondent-father had "abandoned" Megan. April was restored to respondent-mother's physical custody on 2 January 2015.
 

 On or about 6 January 2015, intervenor filed a "Motion to Reopen, Motion to Intervene, and Motion in the Cause for Child Custody" in the juvenile proceeding in Buncombe County. (Original in all caps.) The motion alleged "a substantial change in circumstances" since the 24 January 2014 order granted respondent-mother sole custody of April. Intervenor claimed respondent-mother and respondent-father had "abrogated their constitutionally protected paramount status as the parents of [April]" and were each unfit to care for her.
 

 On 7 January 2015, the trial court entered an
 
 ex parte
 
 order granting intervenor immediate custody of April but later struck its order and returned April to respondent-mother after a hearing on 21 January 2015. The court subsequently allowed intervenor's motion to intervene as April's caretaker under N.C. Gen.Stat. § 7B-401.1(e) (2015), but maintained April in respondent-mother's custody pending a hearing on intervenor's motion in the cause. On 11 March 2015, the District Court in Madison County granted respondent-mother eight hours per week of supervised visitation with Megan but maintained Megan in intervenor's legal and physical custody.
 

 The District Court in Buncombe County heard twelve days of evidence and argument between 26 March and 27 May 2015 on the intervenor's motion to modify custody of April. On 24 April 2015, the trial court entered an interim order granting intervenor weekend visitation with April. On or about 15 July 2015, the trial court entered a "Review Order"
 

 *532
 
 granting intervenor "the sole legal and physical custody of [April]" and scheduling a permanency planning hearing for the 2 November 2015 term. Based on detailed findings of fact spanning fourteen pages and seventy-four numbered paragraphs, the court concluded that (1) since being awarded sole legal and physical custody
 
 *733
 
 of April on 6 November 2013, respondent-mother "has acted in a manner inconsistent with her constitutionally protected paramount status as a parent of [April;]" (2) "[t]here has been a substantial change in circumstances affecting the general welfare and best interest of [April]" since the Review Order [rendered] at the [6 November] 2013 hearing[;]" (3) respondent-mother is "unfit at this time to exercise the primary physical custody of [April;]" and (4) "it is in the best interest of [April] that her sole care, custody and control should be awarded to the intervenor ... subject to visitation with the respondent parents [.]" Respondent-mother filed timely notice of appeal pursuant to N.C. Gen.Stat. § 7B-1001(a)(4) (2015).
 

 I.
 
 Standards of Review
 

 When the trial court awarded respondent-mother sole legal and physical custody of April on 24 January 2014, it did not enter a civil custody order pursuant to N.C. Gen.Stat. § 7B-911 (2013), but retained juvenile court jurisdiction pursuant to N.C. Gen.Stat. § 7B-201 (2013). By allowing April's caretaker to intervene and seek custody of April from respondent-mother, the court was obliged to resolve a custody dispute between a parent and a nonparent in the context of a proceeding under Chapter 7B.
 
 See, e.g.,
 

 In re B.G.,
 

 197 N.C.App. 570
 
 , 571-75,
 
 677 S.E.2d 549
 
 , 550-53 (2009). Our review of the 15 July 2015 "Review Order" thus requires recourse to legal principles typically applied in custody proceedings under N.C. Gen. Stat. Chapter 50, in addition to those governing abuse, neglect, and dependency proceedings under Chapter 7B.
 

 The following standard of review applies to a trial court's order entered after a review hearing under N.C. Gen.Stat. § 7B-906.1 :
 

 Our review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and whether the findings support the conclusions of law. The trial court's findings of fact are conclusive on appeal when supported by any competent evidence, even if the evidence could sustain contrary findings. In choosing an appropriate permanent plan under N.C. Gen.Stat. § 7B-906.1 (2013), the juvenile's best interests are paramount. We review a trial court's determination as to the best interest of the child for an
 
 *533
 
 abuse of discretion. Questions of statutory interpretation are questions of law, which are reviewed
 
 de novo
 
 by an appellate court.
 

 In re J.H.,
 
 --- N.C.App. ----, ----,
 
 780 S.E.2d 228
 
 , 238 (2015) (citations and quotation marks omitted). Unchallenged findings of fact are deemed to be supported by the evidence and are binding on appeal.
 
 Koufman v. Koufman,
 

 330 N.C. 93
 
 , 97,
 
 408 S.E.2d 729
 
 , 731 (1991). Moreover, erroneous findings that are unnecessary to support the trial court's conclusions of law may be disregarded as harmless.
 
 See
 

 In re T.M.,
 

 180 N.C.App. 539
 
 , 547,
 
 638 S.E.2d 236
 
 , 240-41 (2006).
 

 The U.S. Constitution's Due Process Clause protects a "parent's paramount constitutional right to custody and control of his or her children."
 
 Adams v. Tessener,
 

 354 N.C. 57
 
 , 62,
 
 550 S.E.2d 499
 
 , 503 (2001). This protection ensures that "the government may take a child away from his or her natural parent only upon a showing that the parent is unfit to have custody ... or where the parent's conduct is inconsistent with his or her constitutionally protected status[.]"
 

 Id.
 

 (citations omitted). "While this analysis is often applied in civil custody cases under Chapter 50 of the North Carolina General Statutes, it also applies to custody awards arising out of juvenile petitions filed under Chapter 7B."
 
 In re D.M.,
 

 211 N.C.App. 382
 
 , 385,
 
 712 S.E.2d 355
 
 , 357 (2011).
 

 The Due Process Clause further requires that "a trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be supported by clear and convincing evidence."
 
 [3]
 

 Adams,
 

 354 N.C. at 63
 
 ,
 
 550 S.E.2d at
 
 503 (citing
 
 *734
 

 Santosky v. Kramer,
 

 455 U.S. 745
 
 , 747-48,
 
 102 S.Ct. 1388
 
 , 1391-92,
 
 71 L.Ed.2d 599
 
 , 603 (1982) ). "The clear and convincing standard requires evidence that should fully convince. This burden is more exacting than the preponderance of the evidence standard generally applied in civil cases, but less than the beyond a reasonable doubt standard applied in criminal matters."
 
 Scarborough v. Dillard's, Inc.,
 

 363 N.C. 715
 
 , 721,
 
 693 S.E.2d 640
 
 , 643 (2009) (citations and quotation marks omitted),
 
 cert. denied,
 

 563 U.S. 988
 
 ,
 
 131 S.Ct. 2456
 
 ,
 
 179 L.Ed.2d 1211
 
 (2011). Our inquiry as a reviewing court is " 'whether the evidence presented is such that a [fact-finder] applying that evidentiary standard could reasonably find' " the fact in question.
 

 Id.,
 

 693 S.E.2d at 644
 
 (quoting
 
 Anderson v. Liberty Lobby, Inc.,
 

 477 U.S. 242
 
 , 255,
 
 106 S.Ct. 2505
 
 , 2514,
 
 91 L.Ed.2d 202
 
 , 216 (1986) ).
 
 *534
 
 II.
 

 Evidence of Prior Events
 

 Respondent-mother first claims that the trial court erred in relying on "irrelevant evidence" to support its conclusions of law that she acted inconsistently with her constitutionally protected status as a parent, that she was unfit to have custody of April, and that there had been a substantial change in circumstances since the 24 January 2014 review order. (Original in all caps.) She contends that the court wrongly considered evidence of events occurring prior to 6 November 2013-the date on which she obtained sole legal and physical custody of April-in reaching its conclusions of law. Because the court had already accounted for these prior events in its 24 January 2014 review order, respondent-mother argues that the same evidence could not then be used to modify custody. Therefore, according to respondent-mother, "the relevant time frame in this case is 6 November 2013 to [6] January 2015"-the approximate date intervenor filed her motion in the cause.
 

 The "substantial change in circumstances" standard applies to a motion to modify a civil custody order under N.C. Gen.Stat. § 50-13.7(a) (2015), which requires "a showing of changed circumstances by either party or anyone interested."
 
 See
 

 Andrews v. Andrews,
 

 217 N.C.App. 154
 
 , 157,
 
 719 S.E.2d 128
 
 , 130 (2011) ("Our case law has interpreted this standard to require a showing of a substantial change in circumstances affecting the welfare of the child." (citation and quotation marks omitted)),
 
 disc. review denied,
 

 365 N.C. 561
 
 ,
 
 722 S.E.2d 595
 
 (2012). The controlling statute here, N.C. Gen.Stat. § 7B-1000(a) (2015), provides in pertinent part:
 

 Upon motion in the cause or petition, and after notice, the court may conduct a review hearing to determine whether the order of the court is in the best interests of the juvenile, and the court may modify or vacate the order in light of changes in circumstances
 
 or the needs of the juvenile.
 

 (Emphasis added.) In construing substantively identical language in former N.C. Gen. Stat. § 7A-664(a), we held that the statute authorized the court to modify a custody order upon a change in circumstances or "upon a showing that the needs of the juvenile had changed such that it was in her best interest that the order be modified[.]"
 
 In re Botsford,
 

 75 N.C.App. 72
 
 , 75,
 
 330 S.E.2d 23
 
 , 25 (1985).
 

 Nonetheless, we agree with respondent-mother that the burden fell upon intervenor to demonstrate "changes" warranting a modification of the custody arrangement established by the 24 January 2014 review
 
 *535
 
 order.
 
 See
 
 N.C. Gen.Stat. § 7B-1000(a). By definition, such changes must have either occurred or come to light subsequent to the establishment of the
 
 status quo
 
 which intervenor sought to modify.
 
 See
 

 Hensley v. Hensley,
 

 21 N.C.App. 306
 
 , 307,
 
 204 S.E.2d 228
 
 , 229 (1974) (requiring a "showing that circumstances have changed between the time of the [custody] order and the time of the hearing on [the] motion [to modify]");
 
 Newsome v. Newsome,
 

 42 N.C.App. 416
 
 , 425,
 
 256 S.E.2d 849
 
 , 854 (1979) (allowing court to consider " facts pertinent to the custody issue [which] were not disclosed to the court at the time the original custody decree was rendered"). Here, the trial court awarded respondent-mother legal and physical custody of April at the 6 November 2013 review hearing, and entered the attendant review order on 24 January 2014.
 

 However, in assessing whether a change had occurred, the trial court was free to
 
 *735
 
 consider the historical facts of the case in assessing what occurred after respondent-mother was awarded custody of April. While a court may not rely on prior events to find changed circumstances, it may certainly consider facts at issue in light of prior events.
 
 Cf.
 

 Cantrell v. Wishon,
 

 141 N.C.App. 340
 
 , 344,
 
 540 S.E.2d 804
 
 , 806-07 (2000) ("[T]he trial court erroneously placed
 
 no
 
 emphasis on the mother's past behavior, however inconsistent with her rights and responsibilities as a parent[;].... failed to consider the long-term relationship between the mother and her children; ... and failed to make findings on the mother's role in building the relationship between her children and the [nonparent custodians].").
 

 Insofar as respondent-mother faults the trial court for considering evidence and making findings about events that occurred prior to 6 November 2013, we find her objection without merit. Respondent-mother's blanket exception to "[f]indings of fact 16-19, 31-32, parts of 33, and parts of 40" is overruled.
 
 Cf.
 

 In re Beasley,
 

 147 N.C.App. 399
 
 , 405,
 
 555 S.E.2d 643
 
 , 647 (2001) (holding that a "broadside exception that the trial court's conclusion of law is not supported by the evidence, does not present for review the sufficiency of the evidence to support the entire body of the findings of fact").
 

 III.
 
 Respondent-Mother's Constitutionally Protected Status
 

 Respondent-mother next challenges the trial court's conclusions that she "has acted in a manner inconsistent with her constitutionally protected paramount status as a parent" and that she was unfit to have primary physical custody of April. We review these conclusions of law
 
 de novo. See
 

 Boseman v. Jarrell,
 

 364 N.C. 537
 
 , 549,
 
 704 S.E.2d 494
 
 , 502 (2010).
 

 *536
 
 "[P]arents have a constitutionally protected right to the custody, care and control of their child, absent a showing of unfitness to care for the child."
 
 Cantrell,
 

 141 N.C.App. at 342
 
 ,
 
 540 S.E.2d at 806
 
 . "So long as a parent has this paramount interest in the custody of his or her children," the parent's interest prevails in any custody dispute with a nonparent, regardless of the best interests of the child.
 
 Boseman,
 

 364 N.C. at 549
 
 ,
 
 704 S.E.2d at
 
 503 ;
 
 accord
 

 Petersen v. Rogers,
 

 337 N.C. 397
 
 , 403-04,
 
 445 S.E.2d 901
 
 , 905 (1994). However, "[a] parent loses this paramount interest if he or she is found to be unfit or acts inconsistently with his or her constitutionally protected status."
 
 Boseman,
 

 364 N.C. at 549
 
 ,
 
 704 S.E.2d at 503
 
 (citation and quotation marks omitted);
 
 see also
 

 Cantrell,
 

 141 N.C.App. at 342
 
 ,
 
 540 S.E.2d at 806
 
 ("[A] parent may lose the constitutionally protected paramount right to child custody if the parent's conduct is inconsistent with this presumption or if the parent fails to shoulder the responsibilities that are attendant to rearing a child."). Once a parent cedes his or her protected status, custody issues must be resolved based on the best interests of the child.
 
 Price v. Howard,
 

 346 N.C. 68
 
 , 79,
 
 484 S.E.2d 528
 
 , 534-35 (1997).
 

 A.
 
 Action Inconsistent with Constitutionally Protected Status
 

 "[T]here is no bright line beyond which a parent's conduct" amounts to action inconsistent with the parent's constitutionally protected paramount status.
 
 Boseman,
 

 364 N.C. at 549
 
 ,
 
 704 S.E.2d at 503
 
 . Our Supreme Court has emphasized the "fact-sensitive" nature of the inquiry, as well as the need to examine each parent's circumstances on a "case-by-case basis[.]"
 
 See
 

 id.
 

 at 550
 
 ,
 
 704 S.E.2d at 503
 
 ("[D]etermining whether the trial court erred is a fact-sensitive inquiry[.]");
 
 Price,
 

 346 N.C. at 79
 
 ,
 
 484 S.E.2d at 534-35
 
 ("Unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy. Other types of conduct, which must be viewed on a case-by-case basis, can also rise to this level so as to be inconsistent with the protected status of natural parents."). The court must consider "both the legal parent's conduct and his or her intentions"
 
 vis-à-vis
 
 the child.
 
 Estroff v. Chatterjee,
 

 190 N.C.App. 61
 
 , 70,
 
 660 S.E.2d 73
 
 , 78-79 (2008).
 

 1.
 
 Respondent-mother's conduct
 

 In
 
 Price v. Howard,
 
 the court articulated the following principle that guides our determination of whether respondent-mother's actions
 
 *736
 
 were inconsistent with her constitutionally protected status:
 

 [T]he legal right of a parent to custody may yield to the interests of the child where the "parent has voluntarily permitted the child to remain continuously in the custody
 
 *537
 
 of others in their home, and has taken little interest in [the child], thereby substituting such others in his own place, so that they stand
 
 in loco parentis
 
 to the child, and continuing this condition of affairs for so long a time that the love and affection of the child and the foster parents have become mutually engaged, to the extent that a severance of this relationship would tear the heart of the child[ ] and mar his happiness[.]"
 

 Price,
 

 346 N.C. at 75
 
 ,
 
 484 S.E.2d at 532
 
 (quoting
 
 In re Gibbons,
 

 247 N.C. 273
 
 , 280,
 
 101 S.E.2d 16
 
 , 21-22 (1957) ). Likewise, in
 
 Boseman v. Jarrell,
 
 the court held that "if a parent cedes paramount decision-making authority, then, so long as he or she creates no expectation that the arrangement is for only a temporary period, that parent has acted inconsistently with his or her paramount parental status."
 
 Boseman,
 

 364 N.C. at 552
 
 ,
 
 704 S.E.2d at 504
 
 . The
 
 Price
 
 Court recognized, however, "there are circumstances where the responsibility of a parent to act in the best interest of his or her child would require a temporary relinquishment of custody, such as under a foster-parent agreement or during a period of service in the military, a period of poor health, or a search for employment."
 
 Price,
 

 346 N.C. at 83
 
 ,
 
 484 S.E.2d at 537
 
 . When this kind of temporary arrangement is necessary, the parent nonetheless bears some responsibility for preserving his or her constitutionally protected status:
 

 [T]he parent should notify the custodian upon relinquishment of custody that the relinquishment is temporary, and the parent should avoid conduct inconsistent with the protected parental interests. Such conduct would, of course, need to be viewed on a case-by-case basis, but may include failure to maintain personal contact with the child or failure to resume custody when able.
 

 Id.
 
 at 83-84,
 
 484 S.E.2d at 537
 
 .
 

 The trial court made the following findings of fact
 
 [4]
 
 regarding respondent-mother's conduct after being awarded custody of April in November 2013:
 

 *538
 
 6. The intervener became the caretaker for the juvenile [April] on May 4, 2012, pursuant to a kinship placement.... [April] was five months old at the time of placement with the intervener.
 

 ....
 

 9. At the time of the filing of the Juvenile Petition, in August 2012, the respondent mother was pregnant with [Megan]. Upon her birth, [Megan] was immediately placed with the intervener by [DSS] with the consent of the respondent parents.
 

 ....
 

 13. Pursuant to a Review Order entered at the November 6, 2013[ ] term of Buncombe County Juvenile Court (hereafter "the Review Order"), sole legal and physical custody of [April] was returned to the respondent mother.... The juvenile court retained jurisdiction over [April]. The respondent mother was ordered to engage in and complete a parenting class; engage in mental health counseling with the minor child and follow all treatment recommendations; and continue family counseling with the minor child.
 

 *737
 
 14. The respondent mother did complete the ... parenting course on December 2, 2013. She initiated counseling with Ilene Procida ... on November 18, 2013, but according to Ms. Procida's records, she only attended one session in person in 2013. Ms. Procida's records noted a phone call from the respondent mother in December 2013, along with a note at that time that services were being discontinued.... There is no evidence that the respondent mother engaged in any counseling services from the time of that call through the end of 2014.
 

 ....
 

 *539
 
 16. The respondent mother's family, and specifically the intervener and both of her parents, ... significantly supported the respondent mother in 2013 and made it possible for [her] to meet all criteria necessary to regain legal custody of [April]. The intervener provided the respondent mother with a job at the Turkey Creek Café, which the intervener co-owned. [Her father] provided the respondent mother with free housing. All three relatives supervised the respondent mother's visits with [April] under the juvenile court's orders. Because the respondent mother had no transportation during 2013, all three relatives provided the respondent mother transportation to therapy sessions, parenting classes, visitations, work, and essentially anywhere else [she] needed to go.
 

 ....
 

 21. On November 6, 2013, the respondent mother did not make any effort to pick up [April] or otherwise take physical custody of her; did not articulate a plan to the intervener regarding how to transition custody back to her; and did not provide the intervener with any date or other anticipated length of time after which she intended to assume physical custody of the juvenile. Despite the intention of the respondent mother to leave the juvenile with the intervener and not assume custody, she did not provide the intervener with any legal mechanism to provide medical or educational care for the child, such as a power of attorney.
 

 22. Following the entry of the Review Order, [April] remained in the physical custody of the intervener for more than thirteen (13) additional months, until December 19, 2014. During this time period, the respondent mother did not spend any overnights with the juvenile that were not supervised by one of her family members, in the home of a family member.
 
 [5]
 

 *540
 
 23. From November 6, 2013, until December 19, 2014, the respondent mother only sporadically visited with [April] and did not adhere to any set visitation schedule. She would on occasion interact with [April] and [Megan] during her work hours at the Turkey Creek Café until her employment there ended in January of 2014. When her employment there ended, the respondent mother would occasionally text the intervener in an effort to schedule a visit with little notice.... The respondent mother rarely visited the juvenile for more than a half hour to an hour per week during this time period, and at times would go weeks without visiting with her. The respondent mother and her boyfriend [Mr. C.] took [April] and [Megan] away from a family member's home for unsupervised time for a few hours on only two occasions during this period.
 

 24. From November 6, 2013, until December 19, 2014, the respondent mother did not regularly call the intervener to speak to [April] or [Megan]. She would sporadically text the intervener to ask "How's my girls?", but such texts were not on a regular basis.
 

 25. From November 6, 2013, until December 19, 2014, the respondent mother did not provide any financial assistance to either the intervener or her parents for the benefit of [April]. On a few rare occasions, she brought clothes or diapers to the intervener
 
 *738
 
 for [April]. She was not regularly paying child support, as is evidenced by an order for arrest issued for the respondent mother for outstanding child support in the amount of $2,675.55 in Madison County file number 13 CVD 198. When [she was] arrested on that order on December 20, 2014, [Mr. C.] was able to ... pay the amount of child support arrears in full on that same date.
 

 26. From November 6, 2013, until approximately July 2014, the respondent mother was living rent-free with family members and friends and had no vehicle and thus no transportation costs. She was sporadically employed during this period of time. When asked by her father ... around December of 2013 to assist with the increased utility costs after she moved into his home, the respondent mother refused, stating that she needed to help [Mr. C.] make his truck payment. The respondent mother and [Mr. C.]
 

 *541
 
 spent at least two weekends in a hotel in Pigeon Forge, Tennessee, in late 2013 or early 2014, and the respondent mother paid for both [Mr. C.'s] and his friend's hotel room and restaurant meals during one of those weekends[.] ... The respondent mother has maintained gainful employment ... from June 2014 through this hearing.
 

 27. From November 6, 2013, until December 19, 2014, the respondent mother was able-bodied, capable of maintaining gainful employment, and owed a duty of support to [April].
 

 28. From November 6, 2013, until December 19, 2014, the intervener provided for all of [April's] needs, as well as [Megan's] needs, with assistance from [April's] maternal grandparents during her working hours. The intervener fed, clothed, and cared for the daily needs of [April] during this time. The intervener enrolled the juvenile in day care[,] ... enrolled the juvenile in a dance class, and nurtured the juvenile's love of horses by purchasing her a horse and regularly attending horse shows with [April] and [Megan]. Either the intervener or one of her parents handled all medical appointments for [April] during this time.
 

 ....
 

 62. The respondent mother voluntarily allowed custody of [April] to remain with the intervener for an indefinite period of time following the return of legal custody to her on November 6, 2013, with no notice to the intervener that such relinquishment of custody would only be temporary. She failed to advise the intervener of an end date to the intervener's period of custody, failed to establish a transitional plan with the intervener regarding her resumption of custody, and failed to notify the intervener in a clear and definite manner that she intended to resume custody of [April]. The respondent mother induced the intervener, [April], and [Megan] to flourish as a family unit in a relationship of love and duty with no expectation that it would be terminated.
 

 63. The intervener and the respondent mother never agreed that the surrender of [April's] custody to the intervener would be temporary.
 

 *542
 
 64. The respondent mother was legally and physically able to resume custody of [April] on November 6, 2013, and she induced the court to believe the same by accepting the award of custody from the court on that date. By failing to resume custody when she was able on November 6, 2013, the respondent mother acted in a manner inconsistent with her constitutionally protected paramount status as a parent.
 

 The order's conclusions of law repeat the court's determination that respondent-mother "has acted in a manner inconsistent with her constitutionally protected paramount status as a parent of the minor child [April]."
 

 As in
 
 Price,
 
 this case involves a voluntary act of the parent resulting in a "relatively lengthy period of nonparent custody[.]"
 
 Price,
 

 346 N.C. at 82
 
 ,
 
 484 S.E.2d at
 
 536 (citing
 
 Bennett v. Jeffreys,
 

 40 N.Y.2d 543
 
 ,
 
 387 N.Y.S.2d 821
 
 ,
 
 356 N.E.2d 277
 
 (1976) ). Respondent-mother's conduct since obtaining sole legal and physical custody of April on 6 November 2013 represents an abdication of her parental role.
 

 Respondent-mother contends she was not prepared to assume physical custody of April on 6 November 2013, notwithstanding her
 
 *739
 
 representations to the trial court at the time. The 24 January 2014 review order includes explicit findings that respondent-mother "is willing and able to provide adequate care in a safe environment" for April and that she "has adequate resources" to do so. Respondent-mother is estopped to re-litigate the issue of her circumstances as of 6 November 2013 at a subsequent hearing on intervenor's motion to modify custody in 2015.
 
 See
 

 Newsome,
 

 42 N.C.App. at 425
 
 ,
 
 256 S.E.2d at 854
 
 . By her own account, respondent-mother was "completely honest with the Court" about her housing situation when she testified at the 6 November 2013 review hearing. She cannot now claim her housing "was not big enough" for April.
 
 See
 
 id.
 

 ("[A] prior decree is not res judicata as to those facts
 
 not before the court.
 
 " (emphasis added)).
 

 Respondent-mother challenges the trial court's findings that she visited April and asked intervenor about her only "sporadically" between 6 November 2013 and 19 December 2014. These findings are amply supported by intervenor's testimony and the testimonies of April's maternal grandmother and grandfather, who kept April for intervenor on alternate weekends.
 
 [6]
 
 Respondent-mother's assertion that she maintained
 
 *543
 
 "extensive and consistent" contact with April is flatly contradicted by the accounts of these witnesses. (Original in italics.) The trial court was entitled to weigh this competing evidence and determine the credibility of each witness.
 
 In re Hughes,
 

 74 N.C.App. 751
 
 , 759,
 
 330 S.E.2d 213
 
 , 218 (1985). The court was further entitled to view respondent-mother's lack of engagement with April as conduct inconsistent with her constitutionally protected status as parent.
 
 See
 

 McRoy v. Hodges,
 

 160 N.C.App. 381
 
 , 387,
 
 585 S.E.2d 441
 
 , 445 (2003).
 

 Respondent-mother also objects to the findings regarding her failure to provide intervenor with financial support for April's care. She notes that "April's needs were appropriately met" at all times after respondent-mother obtained sole custody of the child on 6 November 2013. (Original in italics.) Regardless of intervenor's performance in caring for April, respondent-mother's failure to provide financial support for her child was properly considered in determining whether she had acted inconsistently with her constitutionally protected status.
 
 See
 

 Price,
 

 346 N.C. at 77
 
 ,
 
 484 S.E.2d at 533
 
 (discussing
 
 Lehr v. Robertson,
 

 463 U.S. 248
 
 , 262,
 
 103 S.Ct. 2985
 
 , 2993-94,
 
 77 L.Ed.2d 614
 
 , 627 (1983) ). Respondent-mother's assertion that she provided assistance to intervenor "[w]hen financially able to do so" is contradicted by the testimony of both intervenor and April's grandfather. The court was entitled to credit the version of events provided by these witnesses. Its findings are also corroborated by respondent-mother's arrest for non-payment of child support in December 2014.
 

 We find unavailing respondent-mother's reliance on our decision in
 
 Grindstaff v. Byers,
 

 152 N.C.App. 288
 
 ,
 
 567 S.E.2d 429
 
 (2002). The father in
 
 Grindstaff
 
 -who "was working two jobs and did not have adequate room for the children"-signed a formal custody agreement placing the children in the care of their maternal grandmother.
 
 Id.
 
 at 290,
 
 567 S.E.2d at 430
 
 . The agreement did not specify a duration but was understood by all parties to be temporary.
 
 Id.
 
 at 296,
 
 567 S.E.2d at 434
 
 . Nine months later, when respondent-father refused to return the children to the grandmother after a visitation, she filed an action for custody.
 
 Id.
 
 at 290-91,
 
 567 S.E.2d at 430-31
 
 . Reversing an order granting custody to the grandmother, we found "no evidence in the record[ ] that the [father] acted inconsistent[ly] with his constitutionally protected status."
 
 Id.
 
 at 298,
 
 567 S.E.2d at 435
 
 . We noted that the father "maintained or attempted to maintain contact and support for his children, and that he resumed custody when his circumstances permitted."
 
 Id.
 
 at 297,
 
 567 S.E.2d at 434
 
 . The "overwhelming evidence" showed that the father "supported the children financially," kept in contact through regular visitation and phone calls, attended the children's medical appointments, provided
 
 *544
 
 their health insurance, and paid for their daycare.
 
 Id.
 
 at 297-98,
 
 567 S.E.2d at 434-35
 
 .
 

 As recounted in the trial court's findings, respondent-mother's actions stand in stark
 
 *740
 
 contrast to the conduct of the father in
 
 Grindstaff.
 
 Respondent-mother placed April with intervenor in May 2012, rather than live apart from her then-boyfriend. She allowed April's newborn sister Megan to join April in intervenor's home in October 2012. Rather than reclaim April on 6 November 2013, respondent-mother left her and her younger sister in intervenor's uninterrupted care until 19 December 2014. During this period, respondent-mother had little meaningful interaction with April and made no effort to provide for her financially. Respondent-mother thus "not only created the family unit that [intervenor] and the child have established, but also induced them to allow that family unit to flourish ... with no expectations that it would be terminated."
 
 Price,
 

 346 N.C. at 83
 
 ,
 
 484 S.E.2d at 537
 
 .
 

 2.
 
 Respondent-mother's intentions
 

 Respondent-mother insists that she intended April's placement with intervenor to be temporary and that intervenor was aware of her intentions.
 
 See
 
 id.
 

 ("[I]f defendant and plaintiff agreed that plaintiff would have custody of the child only for a temporary period of time and defendant sought custody at the end of that period, she would still enjoy a constitutionally protected status absent other conduct inconsistent with that status."). Respondent-mother points to the trial court's findings that she "refused to consent to a change in plan to guardianship at the November 6, 2013 hearing" and that she "gloated [to intervenor] that she had 'won' custody of [April]" as they drove back to Turkey Creek Café following the hearing. As the court further found, however,
 

 [o]n November 6, 2013, the respondent mother did not make any effort to pick up the juvenile or otherwise take physical custody of her; did not articulate a plan to the intervener regarding how to transition custody back to her; and did not provide the intervener with any date or other anticipated length of time after which she intended to assume physical custody of the juvenile. Despite the intention of the respondent mother to leave the juvenile with the intervener and not assume custody, she did not provide the intervener with any legal mechanism to provide medical or educational care for the child, such as a power of attorney.
 

 *545
 
 In light of her subsequent conduct, respondent-mother's mere refusal to authorize intervenor's appointment as April's guardian does not evince an intention to assume her responsibilities as a parent.
 

 Respondent-mother further claims she informed intervenor during a car ride in March 2014 that "she wanted to get her life together so she could have her girls" with her. She testified that intervenor responded by threatening her with a handgun and promising a "blood bath" if she attempted to take April away from intervenor. According to respondent-mother, she did not broach the subject again "due to the fear that her sister and father would cause physical harm to her[.]"
 

 The trial court explicitly found not credible "the respondent-mother's claims that she did not assume custody of [April] until December 19, 2014, due to her fear that the [intervenor] might cause bodily harm to her." The court's findings cite respondent-mother's history of relying on intervenor "for all of her needs" including "comfort and support" as well as respondent-mother's acknowledgement that intervenor "has never assaulted her as an adult and ... has never been charged with any crime[.]" The court noted that intervenor "begrudgingly but voluntarily relinquished custody of [Megan]" to respondent-mother in December 2014 and "followed the proper legal channels" in attempting to regain custody of both children. The court found that respondent-mother thus "had no reasonable basis to believe that she could not exercise her custodial rights to [April] due to any risk of harm posed by the [intervenor]."
 

 Respondent-mother described her intentions toward April as follows:
 

 [Respondent-mother:] (Inaudible). I knew that one day I was going to get my children, as soon as I possibly could and could overcome my fear.
 

 [Intervenor's counsel:] But you never articulated to [intervenor] any specific plan, a time-line or other specific plan of, "These are the steps I'm going to take to get them back by this day["?]
 

 *741
 
 [Respondent-mother:] Not by a certain day. No, ma'am.
 

 [Intervenor's counsel:] It was a very general vague, "I want to get my life together and get them back one day["?]
 

 [Respondent-mother:] Yes.
 

 Intervenor offered the following account of respondent-mother's stated intentions toward April:
 

 *546
 
 [Guardian
 
 ad litem's
 
 counsel:] ... When [respondent-mother] regained custody in November of 2013, when she left court that day, was there some kind of conversation? Did she come to you and say, "I have custody now. Let's talk about how I'm going to get the kids."[?] Did that ever happen?
 

 [Intervenor:] She-no. She rode back to Turkey Creek Café with me. And it was pretty much like this, "I won custody. You didn't. Game over," and just went on with her life like, you know, nothing had changed....
 

 But she never attempted-it was never a conversation of, "Okay. Well, I've got my kids. You know, what's our next step?" That was never, ever brought up.
 

 Regarding the March 2014 car ride, intervenor testified that she asked respondent-mother "what her intentions were[,]" and that respondent-mother replied "that she would like to let the girls come stay with her and [Mr. C.] at some point, but that was about ... the extent of that conversation." Intervenor did not recall threatening a "blood bath" to prevent respondent-mother from taking physical custody of the children.
 

 It is true the trial court must consider "both the legal parent's conduct and his or her intentions" in determining whether the parent acted inconsistently with her constitutionally protected status.
 
 See
 

 Estroff,
 

 190 N.C.App. at 70
 
 ,
 
 660 S.E.2d at 78-79
 
 . As revealed by her testimony, however, respondent-mother's intentions were vague, inchoate, and conveyed to intervenor on just two occasions-immediately after the 6 November 2013 review hearing, and during a car ride in March 2014. Her professed intentions were also completely at odds with her behavior toward April throughout this period. As the trial court found,
 

 [t]he respondent mother voluntarily allowed custody of the juvenile to remain with the intervener for an indefinite period of time following the return of legal custody to her on November 6, 2013, with no notice to the intervener that such relinquishment of custody would only be temporary. She failed to advise the intervener of an end date to the intervener's period of custody, failed to establish a transitional plan with the intervener regarding her resumption of custody, and failed to notify the intervener in a clear and definite manner that she intended to resume custody of the juvenile.
 

 *547
 
 These findings are entirely consistent with both respondent-mother's and intervenor's testimony.
 

 It is axiomatic that a party's "[i]ntent is a mental attitude seldom provable by direct evidence" and "must ordinarily be proved by circumstances from which it may be inferred."
 
 State v. Campbell,
 

 368 N.C. 83
 
 , 87,
 
 772 S.E.2d 440
 
 , 444 (2015) (citation omitted). Where "different inference[s] may be drawn from the evidence, [the trial court] alone determines which inferences to draw and which to reject."
 
 In re Hughes,
 

 74 N.C.App. at 759
 
 , 330 S.E.2d at 218. Here, the trial court found that respondent-mother "induced the [intervenor], [April], and [Megan] to flourish as a family unit in a relationship of love and duty with no expectation that it would be terminated." Inasmuch as "an individual is presumed to intend the natural consequences of the individual's actions[,]" it was reasonable for the trial court to infer that respondent-mother had no meaningful intention that intervenor's custody of April be temporary.
 
 In re J.L.B.M.,
 

 176 N.C.App. 613
 
 , 627-28,
 
 627 S.E.2d 239
 
 , 248 (2006) (citing
 
 State v. Grigsby,
 

 351 N.C. 454
 
 , 457,
 
 526 S.E.2d 460
 
 , 462 (2000) ).
 

 We hold that clear, cogent, and convincing evidence supports the trial court's findings of fact, which in turn support the trial court's conclusion of law that respondent-mother "acted in a manner inconsistent with her constitutionally protected paramount status" as April's parent.
 

 *742
 

 B.
 
 Unfitness
 

 Respondent-mother also challenges the trial court's determination that she is "unfit at this time to exercise the primary physical custody" of April. She contends the court's findings mischaracterize her as "easily agitated, aggressive, and violent" based on a single instance when she allegedly slapped April in the face in May 2014 and accounts of respondent-mother's cruelty to animals and other "childhood behavior" unrelated to her present parenting abilities. Respondent-mother notes that she and Mr. C. have custody of their infant son and care for him appropriately.
 

 Because we have upheld the trial court's conclusion that respondent-mother acted inconsistently with her constitutionally protected status as April's parent, we need not also review the court's determination of her unfitness. As our Supreme Court has explained,
 

 a natural parent may lose his [or her] constitutionally protected right to the control of his [or her] children
 
 in one of two ways:
 
 (1) by a finding of unfitness of the natural parent, or (2) where the natural parent's conduct is
 
 *548
 
 inconsistent with his or her constitutionally protected status. Therefore, ... the trial court's finding of [a parent's] fitness ... [does] not preclude it from granting joint or paramount custody to [a nonparent], based upon its finding that [the parent's] conduct was inconsistent with his [or her] constitutionally protected status.
 

 David N.,
 
 359 N.C. at 307, 608 S.E.2d at 753 (emphasis added). Once the court concluded that respondent-mother had acted inconsistently with her status as a parent, it was required to apply the "best interest of the child" standard when ruling on intervenor's motion for custody.
 
 See
 

 Price,
 

 346 N.C. at 79
 
 ,
 
 484 S.E.2d at
 
 534-35 ;
 
 see also
 
 N.C. Gen.Stat. §§ 7B-903(a), -906.1(i) (2015) (prescribing a "best interests of the juvenile" standard for dispositions and review hearings). Accordingly, we decline to address respondent-mother's argument regarding the trial court's second basis for applying the "best interest of the child" test.
 
 Cf.
 

 In re P.L.P.,
 

 173 N.C.App. 1
 
 , 8,
 
 618 S.E.2d 241
 
 , 246 (2005) (If one of the trial court's grounds for termination of parental rights is valid, "it is unnecessary to address the remaining grounds."),
 
 aff'd per curiam,
 

 360 N.C. 360
 
 ,
 
 625 S.E.2d 779
 
 (2006).
 

 IV.
 
 Substantial Change in Circumstances
 

 Respondent mother next argues that the "trial court erred when it concluded as a matter of law that a substantial change of circumstances had occurred" as required "to warrant a modification of the permanent custody order from the 6 November 2013 [review] hearing."
 
 [7]
 
 (Portion of original in all caps.) She claims the court impermissibly considered evidence of April's mental health and behavioral changes that postdated intervenor's filing of her motion to modify child custody on or about 6 January 2015. Respondent-mother further contends that the evidence fails to establish "that a 'nexus' exists between the changed circumstances and the welfare of the child[.]" (Quoting
 
 Shipman v. Shipman,
 

 357 N.C. 471
 
 , 478,
 
 586 S.E.2d 250
 
 , 255-56 (2003) ).
 

 "[O]nce the custody of a minor child is judicially determined, that order of the court cannot be modified until it is determined that (1) there has been a substantial change in circumstances affecting the welfare of
 
 *549
 
 the child; and (2) a change in custody is in the best interest of the child."
 
 Hibshman v. Hibshman,
 

 212 N.C.App. 113
 
 , 121,
 
 710 S.E.2d 438
 
 , 443 (2011) (citation and ellipsis omitted). "[T]he evidence must demonstrate a connection between the substantial change in circumstances and the welfare of the child, and flowing from that prerequisite is the requirement that the trial court make findings of fact regarding that connection."
 
 Shipman,
 

 357 N.C. at 478
 
 ,
 
 586 S.E.2d at 255
 
 . However, "[w]here the 'effects of the substantial
 
 *743
 
 changes in circumstances on the minor child are self-evident,' there is no need for evidence directly linking the change to the effect on the child."
 
 Lang v. Lang,
 

 197 N.C.App. 746
 
 , 750,
 
 678 S.E.2d 395
 
 , 398 (2009) (ellipsis omitted) (quoting
 
 Shipman,
 

 357 N.C. at 479
 
 ,
 
 586 S.E.2d at
 
 256 ).
 

 The evidence and the trial court's findings amply support its conclusion that "[t]here has been a substantial change in circumstances affecting the general welfare and best interest of [April] since the Review Order entered [after] the November 6, 2013 hearing." The findings reflect respondent-mother's abdication of her parental role since 6 November 2013, as well as her perpetuation of intervenor, April, and Megan "as a family unit in a relationship of love and duty with no expectation that it would be terminated." This substantial change in circumstances was compounded by respondent-mother's decision on 19 December 2014 to wrest April from the only home and caretaker she had known since May 2012, without any notice or transition plan. After regaining custody of April on 21 January 2015, respondent-mother "did not allow the [intervenor] any contact with [April] for six weeks" until the District Court in Madison County granted respondent-mother supervised visitation with Megan. Respondent-mother did not return April to her daycare and "refused to allow [April] any contact with [her] extended family members," other than her grandmother, until the court ordered her to do so on 16 April 2015.
 

 The evidence and the trial court's findings also make plain the adverse effect of the change in circumstances on April. After obtaining emergency custody from the District Court in Madison County on 21 December 2014, intervenor observed behavioral changes in April that included "clinginess to the [intervenor,]" aggression toward Megan, a refusal to nap, and "multiple episodes of aggression toward other children" at daycare. Since returning to respondent-mother's custody in January 2015, April has experienced "extreme difficulty" and distress during transfers back to respondent-mother after visits with intervenor.
 

 The trial court's findings also include the observations of two therapists who worked with April in early 2015. Kristie Sluder performed an
 
 *550
 
 intake assessment of April at intervenor's request on 11 January 2015. Ms. Sluder described April as "clingy[,]" physically possessive of intervenor, and " needing constant reassurance from [intervenor]" in a manner "out of the scale of normal development" for a child of April's age. Noting the importance of " stability" and "[s]ecure attachments" to early childhood development, Ms. Sluder diagnosed April with adjustment disorder and attributed her maladaptive behaviors "to the changes in custody that had occurred in" December 2014 and January 2015. Ms. Sluder described respondent-mother's sudden, unannounced reclamation of April on 19 December 2014 as "disturbing and entirely negligent toward" April.
 

 Respondent-mother engaged Ilene Procida in February 2015 to replace Ms. Sluder as April's therapist. Ms. Procida testified that April "was very emotionally attached" to intervenor and did not display a similar bond with respondent-mother.
 
 [8]
 
 Having observed April as recently as the day before her testimony on 26 March 2015, Ms. Procida described April as "very cautious and tentative around [her] mom" and "very relaxed" with intervenor. Ms. Procida saw signs that respondent-mother was coaching April, noting that April "constantly looks to her biological mother for approval and for-or what to say next" and will "say one thing to [Ms. Procida] if she's alone and then something different if Mom is in the room." April had confided to Ms. Procida "on multiple occasions that she wishes to be with her aunt." Ms. Procida opined that it would be "very upsetting, especially for a toddler[,]" to be suddenly removed from her home and primary caretaker and described respondent-mother's abrupt reclamation of April on 19 December 2014 as "very traumatic" for April.
 

 *744
 
 Ms. Procida characterized April and Megan's relationship as "hugely important" to both girls and believed it would be "wrong" to separate the sisters.
 

 We find no merit to respondent-mother's argument that the trial court erred in considering evidence of April's mental health and behavior after 6 January 2015, the approximate date intervenor filed her motion in the cause. "The party seeking to have the custody order vacated has the burden of showing that circumstances have changed between the time of the order
 
 and the time of the hearing on his motion.
 
 "
 
 Hensley,
 

 21 N.C.App. at 307
 
 ,
 
 204 S.E.2d at 229
 
 (emphasis added);
 

 *551
 
 accord
 
 Crosby v. Crosby,
 

 272 N.C. 235
 
 , 237,
 
 158 S.E.2d 77
 
 , 79 (1967) (discussing rule in child support context). Section 7B-906.1 likewise allows the juvenile court at a review hearing to consider "any evidence ... that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C. Gen.Stat. § 7B-906.1(c).
 

 In
 
 Lang,
 
 this Court held the effects of changed circumstances on the child to be self-evident based on the trial court's findings that "(1) the child needed ADHD medication and [the father] was willing to provide it; (2) [the father] was 'very attentive to the child's progress and behavior in school,' while the mother was less attentive; and (3) '[the father] had been more consistent in treating the child's various recurring medical conditions.' "
 
 Lang,
 
 197 N.C.App. at 751,
 
 678 S.E.2d at 399
 
 (brackets omitted). We further found "the trial court's consideration of the effect of the changes in circumstances on the child [to be] implicit in these three findings in the context of the whole order[.]"
 
 Id.
 
 at 751-52,
 
 678 S.E.2d at 399
 
 .
 

 In this case, the direct connection between the substantial change in circumstances and April's well-being is both self-evident and explained in the trial court's order, as follows:
 

 In making the decision to assume custody of [April] on December 19, 2014, the respondent mother did not consider the trauma that [April] was likely to suffer in being removed from the only caregiver she knew, as well as her sister to whom she was extremely bonded; being denied access to that caregiver and all her extended family to whom she was extremely close; and being removed from her day care environment, all without advance notice to the child or any opportunity for her to physically or emotionally prepare for such a drastic change.
 

 Respondent-mother's argument is overruled.
 

 V.
 
 Best Interest of the Child
 

 In addition to finding a substantial change in circumstances affecting April's welfare, the trial court was required to determine that "a change in custody is in the best interest of the child."
 
 Hibshman,
 

 212 N.C.App. at 121
 
 ,
 
 710 S.E.2d at 443
 
 (citation omitted). We review a trial court's best interest determination for an abuse of discretion.
 
 In re D.S.A.,
 

 181 N.C.App. 715
 
 , 720,
 
 641 S.E.2d 18
 
 , 22 (2007). "A ruling committed to a trial court's discretion is to be accorded great deference and will be upset
 
 *552
 
 only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision."
 
 White v. White,
 

 312 N.C. 770
 
 , 777,
 
 324 S.E.2d 829
 
 , 833 (1985).
 

 Respondent-mother does not directly contest the trial court's assessment of April's best interest. She instead contends that "the trial court is barred from considering the child's best interest without clear and cogent evidence that a substantial change has occurred affecting April's welfare." Because we have rejected respondent-mother's premise that no actionable change in circumstances occurred, her argument as to April's best interest also fails. Moreover, we discern no abuse of discretion in the trial court's conclusion of law that "it is in the best interest of the juvenile [April] that her sole care, custody, and control should be awarded to the [intervenor], subject to visitation with the respondent parents[.]" We affirm the trial court's order.
 

 AFFIRMED.
 

 Chief Judge McGEE and Judge BRYANT concur.
 

 [1]
 

 The parties stipulate to the use of this pseudonym to protect the juvenile's identity.
 

 [2]
 

 We use this pseudonym to protect the juvenile's identity.
 

 [3]
 

 We note the trial court made all of its findings of fact by the requisite "clear, cogent and convincing evidence" standard. (Original in bold and all caps.)
 
 Cf.
 

 David N. v. Jason N.,
 

 359 N.C. 303
 
 , 307,
 
 608 S.E.2d 751
 
 , 754 (2005) ("remand[ing] for findings of fact consistent with this standard").
 

 [4]
 

 Throughout her second argument in her appellant's brief, respondent-mother objects generally to many of the trial court's enumerated findings of fact, to wit: "[F]inding[s] of fact 61-65[;].... "finding[s] of fact 22-24[and] 43[;].... [f]inding of fact 64[;]".... [f]inding of fact 21 [;].... findings 25-28[;] ... [f]indings of fact 37-38[; and].... [f]indings of fact 30-34, and 36[.]" Each of these numbered findings consist of multiple evidentiary facts in paragraphs of varying length. Finding of Fact 61, for example, consists of twenty-one lines of single-spaced text. The great majority of respondent-mother's objections amount to the claim that the trial court should have credited her testimony, rather than the testimony of intervenor and other witnesses. Issues of credibility and the weight to be given to witness testimony "must be resolved by the trial court and are not a basis for overturning a finding of fact."
 
 Elliott v. Muehlbach,
 

 173 N.C.App. 709
 
 , 714,
 
 620 S.E.2d 266
 
 , 270 (2005). Absent a more particularized argument as to particular facts, we decline to review the findings alluded to in respondent-mother's broadside exceptions.
 
 Cf.
 

 Beasley,
 

 147 N.C.App. at 405
 
 ,
 
 555 S.E.2d at 647
 
 .
 

 [5]
 

 Respondent-mother objects to the trial court's use of the word "supervised" in this finding of fact. But the trial court did not suggest that respondent-mother's visits were pursuant to supervised visitation and properly recognized that respondent-mother had been awarded custody at the 6 November 2013 hearing. The trial court used the word "supervised" to indicate that respondent-mother did not spend an overnight visit with the juvenile alone or remove her from the family member's home during these overnight visits.
 

 [6]
 

 The grandmother and grandfather are separated.
 

 [7]
 

 Unlike N.C. Gen.Stat. § 50-13.7(a), the Juvenile Code allows the court to modify custody in an abuse, neglect, or dependency proceeding "in light of changes in circumstances
 
 or the needs of the juvenile.
 
 " N.C. Gen.Stat. § 7B-1000(a) (emphasis added);
 
 see also
 

 Botsford,
 

 75 N.C.App. at 75
 
 , 330 S.E.2d at 25. Because this distinction between the juvenile court and civil court standards does not affect our analysis, we adopt the parties' framing of the issue.
 

 [8]
 

 Although respondent-mother casts Ms. Procida's testimony as "unreliable" in light of her difficulty "recalling dates and pertinent information about April's case[,]" the trial court's credibility determinations are not a viable basis for relief on appeal.
 
 See
 

 Elliott,
 

 173 N.C.App. at 714
 
 ,
 
 620 S.E.2d at 270
 
 .