IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 20-69

Filed: 31 December 2020

Cumberland County, Nos. 18 JA 75-76

IN THE MATTER OF: A.S. & A.C.

Appeal by Respondent-Mother from an Order entered 11 October 2019, by Judge Tiffany M. Whitfield in Cumberland County District Court. Heard in the Court of Appeals 3 November 2020.

*James D. Dill for petitioner-appellee Cumberland County Department of Social Services.*

*Forrest Firm, P.C., by Patrick S. Lineberry, for respondent-appellant mother.*

*K&L Gates, LLP, by Sophie Goodman, for guardian ad litem.*

HAMPSON, Judge.

**Factual and Procedural Background**

Respondent-Mother (Respondent-Mother) appeals from a "Subsequent Permanency Planning Order & Order to Close Juvenile File" (Order) ceasing reunification efforts with her minor child A.C. (Antoinette).[1] The Record reflects the following:

---

[1] Pseudonyms are used pursuant to N.C.R. App. P. 42 to protect the identity of the minor children.

Respondent-Mother is the mother of two minor children—A.S. (Alexis), born March 2011, and A.C. (Antoinette), born December 2009. The Cumberland County Department of Social Services (DSS) became involved in the present case beginning on 22 February 2018, after receiving a Child Protective Services Report regarding the safety of Alexis and Antoinette in October and December of 2017. DSS alleged Alexis and Antoinette were abused, neglected, and dependent. The Petition incorporated the results of child medical examinations performed on both children. During Antoinette's exam, she disclosed Respondent-Mother's then-boyfriend had touched her inappropriately and had made her touch his penis. Alexis's exam revealed markings on her buttocks consistent with a belt mark. Both children informed the medical examiners of behavior that was consistent with their injuries. The same day, DSS obtained nonsecure custody of Alexis and Antoinette, and the sisters were placed with Antoinette's paternal grandparents.

After a hearing on 30 May 2018, the trial court entered its written Adjudication Order on 25 June 2018, formally adjudicating Alexis and Antoinette neglected pursuant to N.C. Gen. Stat. § 7B-101(15) and dismissing the allegations of abuse and dependency. The trial court ordered Alexis and Antoinette remain at their out-of-home placement with Antoinette's paternal grandparents and ordered Respondent-Mother have supervised visitation weekly. The trial court accordingly entered its Disposition Order on 12 September 2018, which continued Alexis and Antoinette's

physical and legal custody with DSS and their placement with Antoinette's paternal grandparents. The Disposition Order continued Respondent-Mother's weekly supervised visitation and granted DSS the authority to expand Respondent-Mother's visitation. The trial court ordered Respondent-Mother: "(a) Continue to engage in mental health counseling; (b) Continue to engage in medication management; (c) Complete age-appropriate parenting classes; (d) Obtain and maintain stable and suitable housing; and (e) obtain and maintain stable employment."

In accordance with N.C. Gen. Stat. § 7B-906.1, the trial court held an initial permanency planning hearing on 5 September 2018, and the trial court entered its written Review and Initial Permanency Planning Order (Initial Order) on 28 January 2019. The Initial Order set the primary permanent plan for both Alexis and Antoinette as reunification with Respondent-Mother with a secondary permanent plan of guardianship. After the initial permanency planning hearing but before the filing of the Initial Order, on 27 December 2018, Respondent-Mother filed for a Domestic Violence Protective Order against her former boyfriend for "threatening to shoot [her] house and kill [her,]" which was granted on 4 January 2019.

The trial court held another permanency planning hearing on 29 January 2019, where the sisters' out-of-home placement with Antoinette's paternal grandparents was continued; however, on 11 February 2019, DSS met with the paternal grandparents and they indicated they could no longer serve as Alexis's

placement. Accordingly, on 19 February 2019, DSS filed a Motion for Review requesting a hearing on the placement of the juveniles. The trial court granted the request to move Alexis to a new placement while Antoinette stayed with her paternal grandparents.

In preparation for a 16 July 2019 subsequent permanency planning hearing, DSS prepared its court report and recommended no changes to either child's permanent plan of reunification. DSS reported Respondent-Mother was actively participating in her recommended services and made herself available to DSS. DSS also noted it had no concerns with Respondent-Mother's ability to provide for the health and safety of her children. The Guardian ad litem report echoed DSS's and recommended the sisters' respective placements remain the same, while Respondent-Mother "should have increased overnight visits that lead up to a trial home visit with both girls."

The trial court held the subsequent permanency planning hearing on 16 July 2019, and entered its written Order on 26 September 2019, which it re-filed on 11 October 2019. At the hearing, both the Guardian ad litem and DSS reports were submitted to the trial court. Social Worker Ebony Alford testified before the trial court and reiterated Respondent-Mother had stable housing, was employed, and was still engaging in counseling and medication management and working with DSS. Alford described Respondent-Mother's visitation and noted "she's only getting one

overnight visit due to her work schedule"; however, Alford also testified Respondent-Mother indicated her employer was willing to switch her shifts if her children were returned to her. Alford recommended the permanent plan remain reunification with Respondent-Mother for both Alexis and Antoinette.

After counsel provided their respective closing arguments, the trial court inquired: "Let me hear from the social worker [DSS]'s position on why the Court should not just proceed with custody in [Antoinette's] matter on today's date." Counsel for Respondent-Mother objected; however, the trial court continued and granted legal and physical custody of Antoinette to her paternal grandparents, eliminating reunification with Respondent-Mother from Antoinette's permanent plan.

In its written Order, the trial court entered Findings of Fact and ordered Alexis's permanent plan should remain reunification with Respondent-Mother; however, consistent with its Order as orally rendered at the hearing, the trial court eliminated reunification from Antoinette's permanent plan, updating it to custody with other suitable persons—her paternal grandparents. The trial court also eliminated Antoinette's secondary plan on the basis "the primary plan of custody with other suitable persons has been achieved[.]" Antoinette's visitation with Respondent-Mother remained unchanged with the option for expansion. Respondent-Mother timely appealed the trial court's Order.

## Issue

On appeal, the issue before this Court is whether the trial court's findings of fact are supported by competent evidence and whether those findings, in turn, support the trial court's conclusions of law.

## Analysis

### I. Standard of Review

"Appellate review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and [if] the findings support the conclusions of law. If the trial court's findings of fact are supported by any competent evidence, they are conclusive on appeal." *In re N.B.*, 240 N.C. App. 353, 358, 771 S.E.2d 562, 566 (2015) (citation and quotation marks omitted). We review the trial court's conclusions of law de novo. *In re K.L.*, 254 N.C. App. 269, 272-73, 802 S.E.2d 588, 591 (2017).

### II. Permanency Planning Order

*A. Findings of Fact*

On appeal, Respondent-Mother challenges a multitude of the trial court's Findings of Fact as unsupported by competent evidence. First, Respondent-Mother contends Finding of Fact 14 is "too vague to shed any meaningful insight into any of the trial court's other findings or conclusions of law." In Finding of Fact 14, the trial court found, citing testimony from the hearing, "[Antoinette] has behaviors when she

comes back from a visit with the Respondent Mother and that this behavior is being addressed in therapy." Indeed, Respondent-Father and the paternal grandfather both testified at the permanency planning hearing regarding Antoinette's behavior when she returned from visitations, including specific examples of her being defiant with her grandparents and Antoinette questioning why Respondent-Father "didn't want her." The Finding is supported by competent evidence reflecting Antoinette has a change in behavior when returning from visitations.

In Finding 22 the trial court found Respondent-Mother "is not [a] fit or proper person for the continued care, custody, or control of the juvenile. She has not remained available to the Court, [DSS], and the Guardian ad litem for the juvenile." The same statement—that Respondent-Mother has not "remained available" to the trial court—is set forth again in Finding 54:

> Based upon the facts herein, the court finds that return of the juveniles to the custody of the Respondents would be contrary to the welfare and best interest of the juvenile. The Respondents are not fit or proper persons for the continued care of the, custody or control of the juveniles. *The Respondents have not remained available to the Court, [DSS], and the Guardian ad Litem for the juvenile."*

(emphasis added).

Respondent-Mother challenges these Findings and correctly highlights they are contradicted by the trial court's other Findings and the Record. Indeed, immediately preceding Finding 22, in Finding 21, the trial court found Respondent-

- 7 -

Mother "is actively participating or cooperating with the permanent plan, [DSS], and the Guardian ad Litem for the juveniles."[2] The Record similarly reflects Respondent-Mother did, in fact, "remain available" to the trial court, DSS, and the Guardian ad litem. Respondent-Mother was present at all the hearings in the underlying case except for the very first, where she was represented by counsel. DSS included in its most recent report prepared for the subsequent permanency planning hearing, that Respondent-Mother "makes herself available to the agency" and was "engaging in her services." Furthermore, there is no evidence in the Record of attempts to contact Respondent-Mother by the trial court, DSS, or the Guardian ad litem that were unsuccessful.

In brief DSS concedes the portion of the Findings repeating Respondent-Mother "has not remained available" is "most likely [ ] a clerical error and should not include [Respondent-Mother] as her availability has not been questioned, only the timeliness of her compliance with her case plan and alleviating the conditions that led to the removal of the juveniles." However, "[a] clerical error is an error resulting from a minor mistake or inadvertence, especially in writing or copying something on the record, and not from judicial reasoning or determination." *In re R.S.M*, 257 N.C.

---

[2] Respondent-Mother also highlights the inconsistency contained within Finding 21 alone: "The Court finds that [Respondent-Mother] is not making adequate progress within a reasonable period of time to achieve the permanent plan. She is actively participating or cooperating with the permanent plan, [DSS], and the Guardian ad Litem for the juveniles." As discussed *infra*, the trial court's finding Respondent-Mother is "not making adequate progress within a reasonable period of time" is not supported by competent evidence in the Record.

App. 21, 23, 809 S.E.2d 134, 136 (2017) (alterations, citations, and quotation marks omitted). The inclusion of the word *not* changes the entire meaning of the trial court's Finding. It is not clear that the trial court's inclusion of the word *not* is merely a clerical error especially as it is included in more than one of the trial court's Findings. Accordingly, Finding 22 and the portion of Finding 54 repeating that Respondent-Mother did not "remain available" is not supported by competent evidence.

Respondent-Mother next challenges Findings 16, 17, 20, and 38 as they relate to the timeliness and purported delay in addressing her case plan:

> 16. The Court finds that at the time of the filling of the Court Report submitted by [DSS] on July 5, 2019, the juvenile had been in the care of [DSS] in excess of 481 days. That is beyond the time frame for creating and finalizing some form of permanency for the juveniles. . . .
>
> 17. The Court finds that with regard to the juveniles, the failure of the Respondents to address issues which gave rise to removal of the juveniles from the home *within a timely manner* and in a reasonable manner, constituted waiver of their constitutional right of paramount custody . . . .
>
>     . . . .
>
> 20. The Court finds that [Respondent-Mother] has been compliant with continuing her therapy services and psychoeducation. She has completed a mental health assessment, a psychiatric assessment and parent psychoeducational classes. She continues to engage in other services as well . . . . She is employed and has stable housing. She has completed parenting classes and in regard to her case plan only needs to remain compliant with ongoing counseling and medication management. However, the Court finds that Respondent Mother's *delay* in fully engaging in this matter has caused the juveniles to remain in foster care for

an unreasonable amount of time without showing to the satisfaction of this court a reasonable answer for not completely satisfying to [sic] objectives laid out at the Disposition in order to reunify with the juveniles . . . .

. . . .

38. . . . On today's date, over 481 days into the case, neither the Respondent Mother or the Respondent Father have completely to the satisfaction of this Court alleviated those issues which led to the removal of [Antoinette] from the home and placed into the custody of [DSS]. . . .

Respondent-Mother contends the Record "does not indicate [Respondent-Mother] delayed in engaging with her case plan in any way that would underwrite the trial court's concerns." Indeed, the Record, including DSS's own reports, reflects the Petition was filed 22 February 2018, and by 1 May 2018, Respondent-Mother was enrolled in treatment and had "participated in a comprehensive clinical assessment." Respondent-Mother had attended her therapy sessions and also enrolled in parenting classes.

On 27 June 2018, DSS prepared its dispositional report and reported Respondent-Mother had housing and employment, yet needed parenting classes, transportation, and to continue with mental health treatment. In an 8 August 2018 report, DSS again reported Respondent-Mother was engaging in her services and made herself available to the agency. DSS noted concerns regarding Respondent-Mother's contact with her former boyfriend at that time but requested Respondent-Mother consent to random home visits to show he was not present in the home. In

letters dated 30 August 2018, and 28 January 2019, Respondent-Mother's Parent Child Interaction Therapist stated Respondent-Mother continued to attend her psychiatric appointments and was "fully compliant with services and treatment recommendations." In multiple reports prepared for subsequent permanency planning hearings, DSS reported Respondent-Mother was engaging in her services and made herself available to DSS. Moreover, in the trial court's subsequent permanency planning order filed 14 April 2019, the trial court found Respondent-Mother "has been fully compliant with therapy and other services that have been recommended[,]" "is employed[,]" and "has engaged in her case plan." The trial court noted it "still ha[d] concerns about [Respondent-Mother's] ability to keep the juveniles safe if placed back in her custody at this time given her contact with [her former boyfriend]. . . ." However, in a subsequent permanency planning order filed 28 May 2019, the trial court made no findings regarding further contact with him. Instead, the trial court found "there are no remaining services for Respondent-Mother to complete on her case plan other than to remain compliant with ongoing counseling and medication management."

Thus, the Record—including DSS's own filings and reports and the trial court's past subsequent permanency planning orders—reflects Respondent-Mother was engaged and compliant in her case plan and made herself available to the trial court, DSS, and the Guardian ad litem. The trial court's Order does not include any specific

findings of fact that support its finding Respondent-Mother delayed in meaningfully engaging with her case plan or referred services. Instead, it appears from the Record within almost two-months of the filing of the Petition and *prior* to the trial court's adjudication of neglect, Respondent-Mother began engaging with her recommended services. There are no reports of Respondent-Mother missing appointments or court hearings or of any additional behavior that would support the trial court's Finding of Respondent-Mother's delay. Accordingly, the portions of the trial court's Findings that purport to find Respondent-Mother delayed in engaging with her case plan and services recommended by DSS are not supported by competent evidence.

Respondent-Mother also contends the portion of Finding 17 stating her failure "to address issues which gave rise to the removal of the juveniles from the home within a timely manner and in a reasonable manner, constituted a waiver of [her] constitutional right of paramount custody" and was "inconsistent with [her] constitutionally protected status as [a] parent[,]" is more appropriately a conclusion of law. We agree and address it *infra*. *See In re A.C.*, 247 N.C. App. 528, 535, 786 S.E.2d 728, 735 (2016).

Respondent Mother also challenges portions of Findings 35, and 36 as unsupported by competent evidence and contends several portions, in addition to Finding 37, are also more appropriately conclusions of law:

> 35. The Court finds that it is not possible for the juveniles to return home immediately, or within the next six (6) months,

inasmuch as the Respondent Parents have not yet fully alleviate[d] the conditions which led to the removal of the juveniles. . . . Finally, as to [Respondent-Mother], the Court notes that she has been complaint [sic] in obtaining and following through with services at this time; however, her compliance with the case plan and fully engagement [sic] in the services previously ordered has reached beyond a reasonable [time] to complete the services that were aimed at alleviating the conditions that led to the juveniles being removed from her care. As such, the juveniles have remained placed outside of the home for an extensive period of time. . . .

36. . . . At the last hearing the Court informed the Respondent Parents that if they did not substantially comply with their case plan to alleviate the issues that led to the removal of the juveniles from the home that [DSS] may possibly be relieved of reunification efforts. [DSS] has made referrals for services for Respondent Mother and Respondent Mother has not taken full advantage of those referrals. . . .

37. The Court finds that inasmuch as the juvenile's placement with a parent is unlikely within six months, a legal guardianship should be established with the Respondents still maintaining the ability to have visitation with the juveniles . . . .

Respondent-Mother contends the trial court's Finding she had "not yet fully alleviate[d] the conditions which led to the removal of the juveniles" is not supported by competent evidence. To the extent this is a finding of fact, we agree with Respondent-Mother. The trial court found, in Finding 18, "Respondent-Mother was ordered to complete the following services at the time of the disposition order *to alleviate the behaviors or conditions which led to the removal of the juveniles*: Mental Health Counseling, Medication Management, Age Appropriate Parenting classes, obtain and maintain stable housing; and to obtain and maintain stable employment."

(emphasis added). Then in Finding 20, the trial court found Respondent-Mother "has been compliant with continuing her therapy services and psychoeducation. . . . She is employed and has stable housing. She has completed parenting classes and in regard to her case plan *only* needs to remain compliant with ongoing counseling and medication management." (emphasis added). Therefore, the trial court's Finding Respondent-Mother "ha[s] not yet fully alleviate[d] the conditions which led to the removal of the juveniles" is not supported by competent evidence. By the terms of the trial court's own Order it appears Respondent-Mother alleviated the conditions that led to the removal of the juveniles—"Mental Health Counseling, Medication Management, Age Appropriate Parenting classes, obtain and maintain stable housing; and to obtain and maintain stable employment."

Instead, it seems the trial court bases Finding 35 on Respondent-Mother's purported delay in "fully alleviat[ing] the conditions which led to the removal of the juveniles." The Finding continued: "her compliance with the case plan and fully engagement [sic] in the services previously order[ed] has reached beyond a reasonable [time] to complete the services . . . ." However, as discussed, the trial court did not make sufficient factual findings regarding Respondent-Mother's delay in engaging with her case plan or offered services. Therefore, this Finding is also not supported by competent evidence in the Record.

Finding 36 contains the conclusory statement that DSS "made referrals for services for Respondent Mother and Respondent Mother has not taken full advantage of those referrals"; however, the Order contains no additional findings elaborating on what services DSS referred Respondent-Mother complete. The Record similarly does not include evidence of any referrals of which Respondent-Mother did not take full advantage of or that remained incomplete. DSS contends this Finding is supported because Respondent-Mother "did not have a viable plan to allow for Antoinette to be placed back in her home nor was she even able to fully exercise overnight weekend visitation . . . ." Although there was no exact plan for altering Respondent-Mother's work schedule presented at the hearing, Alford testified regarding her conversation with Respondent-Mother where Respondent-Mother indicated that she spoke with her employer about altering her schedule should she have custody of her children. Regardless, the trial court made no factual findings to this point. Accordingly, the trial court's conclusory Finding Respondent-Mother did not take full advantage of DSS's referrals is not supported by any competent evidence in the Record.

*B. Conclusions of Law*

Ultimately, Respondent-Mother contends the trial court erred in its Conclusions of Law eliminating reunification from Antoinette's permanent plan.[3] The trial court concluded in mixed Findings of Fact and its express conclusions of

---

[3] In addition to the portions of the above Findings of Fact that operate more as ultimate findings or conclusions of law, Respondent-Mother challenges Conclusions of Law 3, 4, 5, 6, 8, and 11.

law: Respondent-Mother is "not [a] fit or proper person[ ] for the continued care, custody and control of the juveniles"; "Return of the juveniles to the custody of the Respondent Parents would be contrary to the welfare and best interests of the juveniles"; "The primary permanent plan of custody with other suitable persons for [Antoinette] is in her best interest"; and Respondent-Mother's failure "to address issues which gave rise to the removal of the juveniles from the home within a timely manner and in a reasonable manner, constituted waiver of [her] constitutional right of paramount custody" and was "inconsistent with [her] constitutionally protected status as [a] parent." Based upon these conclusions, the trial court eliminated reunification with Respondent-Mother from Antoinette's permanent plan and granted physical and legal custody to her paternal grandparents.

We review the trial court's conclusions of law de novo. *See In re A.C.*, 247 N.C. App. at 535, 786 S.E.2d at 735. We also review "a trial court's determination as to the best interest of the child for an abuse of discretion." *Id.* at 532-33, 786 S.E.2d at 733 (citation and quotation marks omitted). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.H.*, 266 N.C. App. 41, 44, 832 S.E.2d 162, 164 (2019) (citations and quotation marks omitted). However, when a trial court concludes a parent acted inconsistent with his or her constitutionally protected status, "[t]he trial court must clearly 'address whether respondent is unfit

as a parent or if her conduct has been inconsistent with her constitutionally protected status as a parent, should the trial court . . . consider granting custody or guardianship to a nonparent.' " *In re K.L.*, 254 N.C. App. at 283, 802 S.E.2d at 597 (citation omitted) (second alternation in original). Such findings must be supported by clear and convincing evidence, which is "more exacting than the preponderance of the evidence standard generally applied in civil cases, but less than the beyond a reasonable doubt standard applied in criminal matters." *Id.* (citations and quotation marks omitted).

Here, the trial court's conclusions, including that Respondent-Mother was unfit and acting inconsistent with her constitutionally protected status, rests upon the purported findings she did not alleviate the conditions that led to the removal of the juveniles and that she delayed in engaging with her case plan. As discussed *supra*, such findings are unsupported by competent evidence or, in some instances, contradicted by the Record. Accordingly, under our de novo review, the trial court's conclusions of law are error. *See id.* ("No findings of fact in the trial court's order addresses, whether Respondent-mother was unfit or how she was acting inconsistently with her protected status as a parent at the time of the hearing. The trial court's conclusion is unsupported by findings of fact."). If, indeed, the trial court's concerns regarding Respondent-Mother's delay or noncompliance with her case plan are founded, the trial court should make appropriate findings of fact

supported by competent evidence in the Record. Accordingly, the trial court's Order is vacated and this matter is remanded for reconsideration in light of this opinion.

## **Conclusion**

Accordingly, for the foregoing reasons, the trial court's Order eliminating reunification from Antoinette's permanent plan is vacated and the matter is remanded to the trial court for further proceedings consistent with this opinion.

VACATED AND REMANDED.

Judges TYSON and MURPHY concur.