CHERYL L. NEWSOME v. WILLIAM SHUFORD NEWSOME

No. 788DC795

(Filed 31 July 1979)

1. **Divorce and Alimony § 25.7; Husband and Wife § 11; Infants § 6.2— separation agreement awarding child custody—incorporation into divorce decree—no judicial determination of circumstances—no finding of changed circumstances necessary for modification of custody**

Where a separation agreement granting custody of a minor child to its mother was incorporated by reference in a divorce decree, but the question of custody was not litigated and decided by the court after hearing evidence tending to show the circumstances as they then existed relating to the best interest of the child, it was not necessary for the court to find a substantial change of circumstances in order to modify custody of the child, and the court could enter such order as to custody which in its opinion best promoted the interest and welfare of the child.

**2. Divorce and Alimony § 25.11; Infants § 6.3— change of child custody from mother to father**

　　There was an abundance of evidence to support the trial court's finding that the environment in which plaintiff mother had placed her minor child was not in the child's best interest, and the court did not abuse its discretion in awarding custody of the child to its father.

　　Judge CLARK dissenting.

APPEAL by plaintiff from *Jones, Judge.* Judgment entered 10 April 1978 in District Court, WAYNE County. Heard in the Court of Appeals 22 May 1979.

Plaintiff appeals from an order awarding custody of plaintiff's and defendant's minor child, Amy, to defendant. Defendant filed a motion in the cause seeking custody on 6 March 1978.

Plaintiff and defendant were separated in September, 1976, and divorced in October, 1977. A separation agreement granting custody of Amy to plaintiff was incorporated by reference in the divorce decree. Neither the separation agreement nor the divorce decree was included in the record on this appeal.

A hearing on defendant's motion was held on 28 March 1978. Defendant's evidence tends to show that he is presently living with his parents in a three-bedroom home near Wayne Memorial Hospital in Goldsboro. If he is granted custody of Amy, she will live with him and his parents. Defendant and plaintiff were living in a three-bedroom house on Salem Church Road prior to their separation. Plaintiff's mother, Mrs. Langly, lived with them. When defendant left, another woman, Virginia Gooding, who was then employed by the Wayne County Department of Social Services, moved in with plaintiff. Mrs. Langly occupied one bedroom, Amy another, and plaintiff and Virginia Gooding slept together in a double bed in the third bedroom.

At the time of the divorce, plaintiff, Amy and Gooding moved to a two-bedroom apartment on Mulberry Street. Defendant would go there to pick up Amy for her visits. He testified that the drapes were always drawn, the apartment was dark and there were notices on the door which read, "by appointment only."

About mid-November, defendant discovered that plaintiff had moved from the Mulberry Street residence. He tried to phone and went by the apartment but found no one. He called plaintiff's

place of employment, the Community Development School in Goldsboro, and was told that she was no longer employed. He called Gooding's employer and was told that she also was no longer employed. He paid a support payment which was due to the clerk of court because he was unable to locate his wife or his child.

Plaintiff called defendant a week later to tell him that she had moved to Winston-Salem. He received a letter from her which stated that Amy was in a day care center and gave their address. Defendant went to that home in December to visit Amy a week after her birthday. He described it as a small house located on the end of the street. Plaintiff and Virginia Gooding were living together in that house. Defendant's opportunity to visit with his child became more difficult after plaintiff moved.

Defendant testified that it was after his divorce that he received information to support the allegations in his motion for change of custody. His motion was, in part, as follows:

"9. Shortly after the entry of [the divorce decree], the plaintiff and the said Virginia Gooding simultaneously terminated their employment in Goldsboro, North Carolina, and surreptitiously moved their residence to Winston-Salem, North Carolina, without notice to the defendant or his family. For a period of time the plaintiff refused to divulge any details concerning the whereabouts of the minor child, her own whereabouts, her own employment, her place of residence, or any other details of vital concern to the defendant concerning the minor child.

10. The defendant is informed and believes, and upon such information and belief alleges, that the plaintiff has engaged in an illicit homosexual relationship with the said Virginia Gooding; and has conducted said homosexual relationship in the presence and on the premises occupied by the minor child. The defendant further alleges on information and belief that the homosexual activities of the plaintiff are detrimental to the health, safety, welfare and general well-being of the minor child; and that it would be in the best interest of said minor child that she be removed from the presence of, or association with such activities, and placed in the custody of the defendant."

Newsome v. Newsome

Mrs. Langly, plaintiff's mother, testified that she was living with plaintiff and defendant on Salem Church Road at the time of their separation. The house had originally belonged to Mrs. Langly. Virginia Gooding moved into the bedroom with plaintiff soon after defendant moved out. The pair shared a double bed. Mrs. Langly had keys to all of the locks but plaintiff changed the locks on the entryway to the room she shared with Gooding and the baby's bedroom so that Mrs. Langly was unable to enter. Mrs. Langly also testified, in part, as follows:

"Virginia gradually took over the bathing of the minor child.

I had a chance to observe Virginia Gooding aiding with the bath of the minor child Amy on several occasions. She would lay the child, she would towel dry the child in front of the fireplace. She would get the bottle of vaseline and say we are going to use your night creme. She would use her forefinger. She would rub her genital area back and forth when there was no apparent diaper rash on this child.

\* \* \*

I saw Ms. Gooding perform this act that I described. I don't know if she called it indecent liberties, sexual seduction. I don't know what it was; it disturbed me greatly. I mentioned it to my daughter and she acted as if she'd nothing to do. It was just a normal thing for her.

\* \* \*

I reported what I have seen with my daughter. I tried to have a conversation about it with her. Also Virginia Gooding had a lot of bronchial trouble this winter and she would embrace the child and kiss her in the mouth when she was taking antibiotics, out of work because of her bronchial infection.

During the time that my daughter and Virginia Gooding were using the same bedroom, I tried to discuss that with Cheryl, but she wouldn't discuss anything. There were a lot of magazines, M.S. magazines. . . .

\* \* \*

I tried to discuss it with her but was not able to. I couldn't get anywhere with her.

* * *

My daughter had a phlebitis condition. She was out of work for a while. Ms. Gooding would rub her legs.

In November of 1976, my daughter and Ms. Gooding took a trip. They told me they went to New York City during Thanksgiving Holidays. They were gone around six days. . . . [T]hey were both wearing wedding rings.

* * *

They were both wearing gold bands on their right hands, that would be the third finger of the right hand not counting the thumb. I saw both of these pieces of jewelry. They both looked alike to me. I asked my daughter about the rings several times but there was never any concrete answer."

Mrs. Langly moved out but continued to try to communicate with her daughter. Finally, she wrote her a letter in which she pointed out, among other things, how plaintiff just a year earlier had described Virginia Gooding as being a gross person with hairy armpits and unshaven legs, who disturbed plaintiff and her husband with long and unwelcome visits. She tried to point out the harassment and ridicule the child, Amy, would have to endure because of plaintiff's lifestyle. Plaintiff was unresponsive.

Mrs. Elizabeth Richards, plaintiff's former co-worker, testified that she had a conversation with plaintiff in August or September of 1977 concerning plaintiff's homosexuality. Virginia Gooding had called Mrs. Richards and asked that she not tell the school officials about plaintiff's homosexuality. Mrs. Richards told plaintiff that she would not tell because plaintiff was a good teacher and her homosexuality did not affect her work. Mrs. Richards and plaintiff discussed the problems homosexuals have in dealing with relatives and society. Plaintiff unequivocally admitted that she was a homosexual. Plaintiff also talked with Mrs. Richards on another occasion about the problems she was encountering as a homosexual.

Mrs. Richards and her husband helped plaintiff move in mid-November. Plaintiff stated that her lawyer had told her not to tell defendant that she was moving. Mrs. Richards testified that plaintiff was a good mother to Amy and she had a good relationship with her. Amy was well cared for.

Defendant's father testified that defendant lived with him and often brought Amy to visit during the visitation periods. Defendant would only have her for an hour or two between the time he got off work and the time she went to bed. He was not allowed to keep her overnight. Amy adores her father. If defendant gets custody of Amy, Mr. and Mrs. Newsome would not object to having Amy in their home. They would raise her as they had their own children. They would not object to allowing plaintiff and Mrs. Langly visitation rights. The Newsomes attend church in Goldsboro.

Mr. Newsome testified that plaintiff is a good mother for Amy and has a good relationship with her. Defendant spent as much time with Amy prior to his separation as any father would. Defendant's mother, Mrs. Newsome, testified that Amy and her father have a great relationship. If defendant was granted custody, the Newsomes would allow plaintiff and Mrs. Langley visitation privileges. Mrs. Newsome thinks plaintiff is over-possessive but otherwise is a good mother. She knows nothing about the relationship between plaintiff and Gooding.

Defendant was recalled and testified that if Amy came to live with him, he would welcome plaintiff and Mrs. Langly to visit. He loves Amy and would be willing to include Amy in his hobbies and give up some of his interests. Defendant has tried to extend his visitation privileges but it has been an uphill battle. In general, he could provide a good home for Amy.

Plaintiff's evidence tends to show that Amy was born on 12 December 1974. She is presently living in Winston-Salem with Amy in a house which has a large fenced-in backyard. Amy has her own room. Virginia Gooding lives with them but is unemployed. Plaintiff is working for Horizons Residential Care Center. Gooding quit her job in Wayne County and moved to Winston-Salem with plaintiff and Amy. Amy is presently in a private day care situation because the prior day care group had too many children. She has a good relationship with Amy.

Plaintiff denied being a homosexual. She testified that defendant had told her that he had heard a rumor to the effect that she was a homosexual. Plaintiff believes that Mrs. Langly started this rumor. Plaintiff talked with Mrs. Richards about this rumor and about Mrs. Langly's letter. Plaintiff and Mrs. Richards dis-

cussed homosexuality in general but never talked about plaintiff. The only information Mrs. Richards could have given the school was that there was a rumor that plaintiff was a homosexual. Plaintiff did not know that Gooding had called Mrs. Richards and asked that she not report plaintiff's homosexuality to the school.

Plaintiff stated that she has not dated since her separation because she wants to be with Amy. She admitted that she and Ms. Gooding purchased rings in New York but denied that they were wedding rings. She admitted that she and Gooding "cohabited and spent the nights in the same double bed" but claimed that she had no other beds and insisted that Amy have her own room. She refused to sleep in her mother's old room on Salem Church Road after Mrs. Langly left because it would be traumatic. There was also no bed because Mrs. Langly had taken the furniture. Plaintiff saw a psychologist because she was going through a difficult period with her separation and that of her parents. Her mother was accusing her father of potential sexual molestation of Amy. Gooding moved in with them because plaintiff needed help with the bills. She was very supportive of plaintiff during this difficult period.

When plaintiff learned of her job in Winston-Salem, she gave her Goldsboro employer twenty-seven days' notice. Plaintiff did not write defendant about her new job and did not call him because he told her not to call him at his parents' home. On the day plaintiff moved to Winston-Salem, she tried to call defendant at his office several times. He was either out or not taking any calls. She finally contacted him and told him that she and Amy were in Winston-Salem but that she did not know her telephone number or address. Defendant indicated that there were no problems other than that his parents were upset that she had moved. She later wrote him as to her address. She also called to give him the exact location. She gave him her telephone number but asked that it remain private because she had been receiving a lot of harassing calls. Prior to plaintiff's moving to Winston-Salem, defendant saw Amy every Friday for about two hours. She denied unreasonable limitation of his visitation privileges.

Several of plaintiff's friends testified that plaintiff had a good relationship with the child and that she was a good mother. None of them admitted to any knowledge of a homosexual relationship

between plaintiff and Virginia Gooding. Plaintiff did not present Gooding's testimony for consideration by the court.

The judge made evidentiary findings of fact substantially in accordance with defendant's evidence except that he did not label plaintiff's relationship with Virginia Gooding as homosexual. His findings of ultimate facts included the following:

"23. The evidence presented by both the plaintiff and the defendant tends to show that the plaintiff has in fact been a good mother to the minor child, Amy Franklin Newsome, in that she has provided very sufficiently for the physical needs and requirements for said minor child.

24. The Court further finds that the environment in which the minor child is now being raised is not conducive or beneficial to the raising of a minor child of such tender years; and further finds that the defendant did not discover the existence of such environment until February of 1978.

25. The Court further finds that the plaintiff, Cheryl L. Newsome, is a loving mother who cares for and is interested in the well-being of the said minor child.

26. The Court further finds that the home of Mr. and Mrs. George R. Newsome, the parents of the defendant, is a fit and proper environment for the raising of the minor child.

27. The defendant, William S. Newsome, is desirous of obtaining the care, custody and control of the above named minor child, and the said Mr. and Mrs. George R. Newsome are willing to assist the defendant to the best of their ability in providing for the care, custody and control of the minor child."

The court concluded as a matter of law that there has been a substantial change of circumstances since the entry of the October, 1977, divorce decree. He ruled that defendant was a fit and proper person to have the care, custody and control of Amy and that plaitniff was a fit and proper person to have visitation privileges but expressly provided that the child should be kept out of the presence of Virginia Gooding. He, therefore, awarded custody of Amy to defendant and visitation privileges to plaintiff. From this judgment plaintiff appeals.

*Pfefferkorn & Cooley, by William G. Pfefferkorn, Jim D. Cooley, J. Wilson Parker and Robert M. Elliot, for plaintiff appellant.*

*Taylor, Warren, Kerr & Walker, by Robert D. Walker, Jr., for defendant appellee.*

VAUGHN, Judge.

[1]  Much of the argument in the briefs is directed to whether there was evidence of a substantial change of circumstances so as to warrant a modification of the earlier "decree of custody." Neither the separation agreement nor the divorce decree was made a part of the record on appeal. We are advised only that "the divorce decree incorporated the separation agreement by reference." There is no indication, however, that the question of custody was litigated and decided by the judge after hearing evidence tending to show the circumstances as they then existed relating to the best interest of this child. It appears, therefore, that the court merely approved the contract made between the parties. It is clear, however, that "Parties may never withdraw children from the protective supervision of the court." *Bunn v. Bunn,* 262 N.C. 67, 69, 136 S.E. 2d 240 (1964).

> "No agreement or contract between husband and wife will serve to deprive the court of its inherent as well as statutory authority to protect the interests and provide for the welfare of infants. They may bind themselves by separate agreement or by a consent judgment . . . but they cannot thus withdraw children of the marriage from the protective custody of the court. . . . The child is not a party to such agreement and the parents cannot contract away the jurisdiction of the court which is always alert in the discharge of its duty toward its wards—the children of the State whose personal or property interests require protection. . . . In such case the welfare of the child is the paramount consideration to which even parental love must yield, and the court will not suffer its authority in this regard to be either withdrawn or curtailed by any act of the parties." *Story v. Story,* 221 N.C. 114, 116, 19 S.E. 2d 136 (1942) (citations omitted).

We need not tarry long then on the question of whether there has been a "change of circumstances" or whether the same

circumstances existed at the time of the divorce. The duty of the trial judge was to enter such order respecting the child as he felt would best promote the interest and welfare of the child, a question that had not previously been decided by a court on the basis of evidence tending to show the environment in which the child was being kept. The reason behind the often stated requirement that there must be a change of circumstances before a custody decree can be modified is to prevent *relitigation* of conduct and circumstances that antedate the prior custody order. It assumes, therefore, that such conduct has been litigated and that a court has entered a judgment based on that conduct. The rule prevents the dissatisfied party from presenting those circumstances to another court in the hopes that different conclusions will be drawn. For instance, the rule was applied in *Stanback v. Stanback*, 266 N.C. 72, 145 S.E. 2d 332 (1965), where one Superior Court judge entered an order placing the children with their father. Sixteen days later, the mother sought a different result before a different judge. A hearing was held where essentially the same conduct was litigated. That judge reached a different conclusion. The Supreme Court reversed, noting that there could be no appeal from one Superior Court judge to another and that the dissatisfied parent should have either appealed the first order or awaited a more favorable factual background. The rule is designed to prevent constant relitigation of the same questions with the resulting turmoil and insecurity. *Shepherd v. Shepherd*, 273 N.C. 71, 159 S.E. 2d 357 (1968).

When, however, as in the present case, facts pertinent to the custody issue were not disclosed to the court at the time the original custody decree was rendered, courts have held that a prior decree is not res judicata as to those facts not before the court. Thus, in *Stewart v. Stewart*, 86 Idaho 108, 383 P. 2d 617 (1963), the Court stated that where facts affecting a child's welfare existed at the time of the entry of a custody decree but were not disclosed to the court, especially in default cases, these facts may be considered in a subsequent custody determination. *Accord, Boone v. Boone*, 150 F. 2d 153 (1945); *Perez v. Hester*, 272 Ala. 564, 133 So. 2d 199 (1961); *Henkell v. Henkell*, 224 Ark. 366, 273 S.W. 2d 402 (1954); *Weatherall v. Weatherall*, 450 P. 2d 497 (Okla. 1969). *See generally*, Annot. 9 A.L.R. 2d 623 (1950).

Suppose, for instance, it should appear that, unknown to the first judge, the child had been regularly confined to a closet for long periods of time or otherwise abused, but these facts are made known to the second judge. Surely it could not be said that the second judge is powerless to act merely because the circumstances are the same in that the abuse is no greater or the environment no worse than before. Moreover, evidence of the abusive environment that existed prior to the first hearing (but unknown to the judge who conducted that hearing) could properly be considered by the judge conducting the second hearing in deciding what disposition of the case would be in the best interest of the child.

[2]   The statute requires that the judge shall award "the custody of such child to such person, agency, organization or institution as will, *in the opinion of the judge*, best promote the interest and welfare of the child." G.S. 50-13.2(a) (emphasis added). The judge obviously entered the order that in his judgment or *his opinion* was in the best interest of the child. The question is, therefore, whether we in the appellate division must reverse that judgment and hold that, as a matter of law, the trial judge was obliged to have reached a different opinion. Decisions in custody cases are never easy. The trial judge has the opportunity to see the parties in person and to hear the witnesses. He can detect tenors, tones and flavors that are lost in the bare printed record read months later by appellate judges. His decision should not be reversed in the absence of a clear showing of abuse of discretion. *In re Custody of Pitts*, 2 N.C. App. 211, 162 S.E. 2d 524 (1968):

> "When the court finds that both parties are fit and proper persons to have custody of the children involved, as it did here, and thus finds that it is to the best interest of the children for the father to have custody of said children, such holding will be upheld when it is supported by competent evidence." *Hinkle v. Hinkle*, 266 N.C. 189, 196, 146 S.E. 2d 73 (1966).

In summary, the majority of this panel of judges concludes that, although there was evidence to support the judge's finding that there had been a material change of circumstances, the finding was unnecessary in this case for the reasons we have stated. The statute requires the judge to enter such order which *in his*

---
**Newsome v. Newsome**
---

*opinion* best promotes the interest and welfare of the child. Sure-
ly no one could contend that Judge Jones did otherwise in this
case. Finally, the order should be reversed only if an abuse of
discretion has been found and the majority of this panel finds
none. There is certainly an abundance of evidence to support the
critical finding that the environment in which plaintiff has placed
the child is not in the child's best interest. The evidence would
have supported much stronger findings. It may well be that the
judge struggled to spare the child as much future embarrassment
as possible.

Affirmed.

Judge CARLTON concurs.

Judge CLARK dissents.

Judge CLARK dissenting.

On 9 October 1978 defendant filed a verified motion for
dismissal of the appeal alleging that plaintiff had on 1 September
1978 taken the child for a weekend visitation and had not re-
turned the child as provided by the court order, and that plaintiff
had informed defendant that she had taken and would not return
the child. Plaintiff's counsel responded that the allegations in the
motion were unsubstantiated hearsay. The motion was denied on
30 October 1978. If the allegations are true plaintiff has violated
G.S. 14-320.1, a felony. I vote to stay appellate proceedings and
remove to the trial court for findings of fact and for determina-
tion of custodial matters in light of the facts found. *See Jones v.
Cotten*, 108 N.C. 457, 13 S.E. 161 (1891).

Further, I do not agree with the majority opinion because it
is based on assumptions relative to the provisions of the divorce
and custody decree though the decree was not in the record on
appeal, and because it ignores the established law of this State
relative to modification of a custody decree, and to the standards
for findings of fact and conclusions of law which should support
an adjudication of custody. *See* G.S. 50-13.7(a); *Blackley v.
Blackley*, 285 N.C. 358, 204 S.E. 2d 678 (1974); *Shepherd v.
Shepherd*, 273 N.C. 71, 159 S.E. 2d 357 (1968); *Steele v. Steele*, 36

N.C. App. 601, 244 S.E. 2d 466 (1978); *Owen v. Owen*, 31 N.C. App. 230, 229 S.E. 2d 49 (1976); *Paschall v. Paschall*, 21 N.C. App. 120, 203 S.E. 2d 337 (1974); *Register v. Register*, 18 N.C. App. 333, 196 S.E. 2d 550 (1973).