IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-136

Filed 7 November 2023

Mecklenburg County, No. 16CVD20214

KARIN A. CONROY, Plaintiff,

v.

MARK. W. CONROY, Defendant.

Appeal by plaintiff from judgment entered 25 May 2022 by Judge Karen D. McCallum in Mecklenburg County District Court. Heard in the Court of Appeals 4 October 2023.

> *Plumides, Romano & Johnson, PC, by Richard B. Johnson, for the plaintiff-appellant.*

> *James, McElroy & Diehl, P.A., by Preston O. Odom, III, Jonathan D. Feit, Kristin J. Rempe, and Caroline D. Weyandt, for the defendant-appellee.*

TYSON, Judge.

Karin Conroy ("Mother") appeals from an order modifying the custody of Mother's and Mark Conroy's ("Father") four children. We affirm.

## I. Background

Mother and Father were married on 4 October 2003. Mother and Father are parents of four children: Christopher, born on 25 September 2006; Kathryn ("Kate"), born on 11 August 2008; Daniel, born on 27 December 2009; and Michael, born on 5 February 2012.

Mother and Father legally separated on 7 March 2015. A Judgment of Absolute Divorce was entered on 16 July 2018. On 18 June 2019, the district court entered a Permanent Child Custody Order ("2019 Custody Order").

The 2019 Custody Order found the following facts regarding Mother's behaviors and her relationship with Father:

> 11. Plaintiff/Mother has a concerning history of fractured relationships, particularly with members of her family and Defendant/Father's family. Between 2001, when the parties met, and the parties' date of separation, Plaintiff/Mother was often angry with at least one of her family members or close friends.
>
> 12. In demonstrating said anger, the cause of which was often unknown to others, Plaintiff/Mother refused to speak to the person with whom she was angry, sometimes for months and sometimes for years. Once the minor children were born, Plaintiff/Mother often did not allow the person with whom she was angry to interact with the minor children, despite Defendant/Father's requests for her to do so.
>
> . . .
>
> 16. As of March 2018, Plaintiff/Mother's inappropriate behaviors had not improved. Among other concerning behaviors, Plaintiff/Mother routinely disparaged Defendant/Father directly to and in the presence of the minor children; acted in other ways designed to undermine his role as the minor children's father; unreasonably interfered with Defendant/Father's parenting time; and, in making decisions that impacted the minor children, repeatedly failed to put the minor children's best interests first, but instead often prioritized being disagreeable with Defendant/Father and creating and/or furthering difficult and/or less than ideal circumstances for Defendant/Father, often at times the minor children were in his care.

17. In March 2018, and in an effort to spend more time with the minor children and have a greater opportunity to combat Plaintiff/Mother's inappropriate behaviors, Defendant/Father informed Plaintiff/Mother that he wished to extend his alternating Sunday overnight through Monday morning. He has routinely done so since March 2018.

18. Since March 2018, Plaintiff/Mother has repeatedly withheld the minor children from Defendant/Father, sometimes for days and once for Defendant/Father's entire custodial weekend.

. . .

23. Plaintiff/Mother dislikes Defendant/Father's family and is not supportive of the minor children's relationships with Defendant/Father's family. Plaintiff/Mother has disparaged Defendant/Father's parents in the presence of the minor children, refuses to speak to Defendant/Father's parents at the minor children's activities (at times they are there), and accuses Defendant/Father of relying on his parents for help with caring for the minor children. The Court does not find that Defendant/Father's parents serve primarily as caregivers when visiting Defendant/Father and the minor children, but instead come to Charlotte to spend quality time with their son and grandchildren.

The 2019 Custody Order granted Mother and Father joint legal custody of the minor children. During the school year, Mother and Father shared parenting time with the children on a nine to five schedule, meaning the children spent nine days out of every two weeks with Mother and five days with Father. During the summer, custody between Mother and Father alternated on a weekly basis, and each parent was allowed to plan two continuous weeks of vacation with the children. School-year

breaks and holidays, including Memorial Day Weekend, Labor Day, Halloween, Thanksgiving, Christmas, and Winter Break, were evenly divided between Mother and Father and set on an alternating basis, with Spring Break and Easter being the exception. Father was granted custody of the children for the duration of spring break every year, and Mother was awarded Easter weekend beginning in the afternoon on Good Friday.

Mother was represented by attorney Tiyesha DeCosta ("DeCosta") for the hearings held on 12 and 17 November 2020 regarding her claims for equitable distribution, child support, and attorney's fees. Mother was previously represented by attorneys Gena Morris and Caroline Mitchell, and later by attorney Steve Ockerman, before seeking DeCosta's representation.

Almost two years after the 2019 Custody Order was entered, the Honorable Karen D. McCallum ("Judge McCallum") entered an Order and Judgment on 3 March 2021 regarding Mother's and Father's equitable distribution, child support, and attorney's fees claims. After entry of the 2021 Order, Mother was displeased, as "she believed that Defendant/Father [had] 'won' the equitable distribution and child support trial."

A month after Judge McCallum entered the order, Mother filed a Motion for Emergency Custody, Motion for Modification of Custody, and Motion for Attorney's Fees on 6 April 2021. Mother asserted Father had physically abused Daniel, and she moved for temporary sole custody of all four children and primary physical custody

on a permanent basis.

In the same week Mother filed her motion to modify custody, she left a note in Father's mailbox stating, "HAS LEAVING YOUR FAMILY BEEN WORTH IT?" She also reported Father's alleged abuse to Department of Social Services ("DSS"), which was the third time Mother had alleged abuse and reported Father to DSS.

Father responded to Mother's Motion for Emergency Custody and also filed a Motion to Modify Custody, Motion for Temporary Parenting Arrangement, Motion for Sanctions, Motion to Strike, and Motion for Contempt on 14 April 2021. Father's motion referenced Mother's decision to report unsubstantiated allegations concerning him to DSS, leaving a threatening note in his mailbox, and threatening Father by promising "the litigation 'will never end' and that she will 'never stop trying to ruin' Defendant/Father."

A hearing regarding Mother's Motion for Emergency Custody was held on 15 April 2021. Mother, Father, Daniel, Mother's neighbor, and a Child Protective Services ("CPS") investigative social worker testified. Judge McCallum denied Mother's Motion for Emergency Custody on 21 October 2021.

Judge McCallum found Mother's testimony "completely uncredible[,]" because: (1) it appeared Mother had coached Daniel and Michael; (2) the other children had "purportedly slept through the entire incident, which is not believable if Defendant/Father w[as] really punching Dan[iel] 'repeatedly' in the nose, head, and neck"; (3) Mother admitted she had "encouraged" Daniel to get inside the car with

Father after the alleged incident; (4) Mother did not check on the child at school following the alleged incident; (5) Mother did not report the incident to the school or the police; (6) Mother failed to take Daniel to receive any medical treatment; and, (7) Mother had waited four days to report the alleged abuse to DSS. Judge McCallum also noted and found Mother's three prior allegations of Father's actions to DSS each came "on the eve of an important court date[,]" and each of the prior reports were "unsubstantiated."

In the months following the emergency custody hearing, Mother filed many motions, which delayed hearings on some of her motions and Father's motions. Mother filed a Motion to Recuse Judge McCallum on 29 April 2021 ("First Motion to Recuse"). Mother asserted she could not receive a fair and impartial hearing, citing Judge McCallum's purported facial expressions and remarks she had made during the 15 April 2021 hearing concerning Mother's improper retrieval of documents from DSS, and Mother's unlawful *ex parte* emails to Judge McCallum.

A hearing on Father's claim of contempt was originally scheduled for 2 June 2021. The trial court continued Father's motion for contempt, reasoning Mother's First Motion to Recuse needed resolution before proceeding on any of the other pending motions and issues before the Court. Mother voluntarily dismissed her First Motion to Recuse without prejudice and filed a second Motion to Recuse ("Second Motion to Recuse") at approximately 2:15 p.m. on 2 June 2021, the date of the hearing. The hearing was scheduled to begin at 4:00 p.m. At 4:01 p.m., DeCosta emailed Judge

McCallum and Father's attorney, Jonathan Feit ("Feit") a copy of the voluntary dismissal and the Second Motion to Recuse.

DeCosta sought a continuance of the 2 June 2021 hearing in light of dismissal of her Second Motion to Recuse. Father waived prior notice, and Judge McCallum denied Mother's request for continuance. At the hearing, DeCosta explained she had filed the Second Motion to Recuse because Judge McCallum had issued an order for DeCosta to show cause in an unrelated matter, and she believed this order to show cause demonstrated Judge McCallum's "animus" and "bias" towards her as counsel.

Judge McCallum denied Mother's Second Motion to Recuse because: "neither the allegations made nor the evidence presented constitute[d] sufficient evidence to objectively demonstrate that recusal [wa]s warranted[,]" Mother's testimony regarding Judge McCallum's purported denial of DeCosta's request to cross-examine the CPS caseworker was "patently false," and DeCosta had "elicited perjured testimony from her client[.]"

Father rescheduled the hearing on his Motion for Contempt for 3 August 2021. On 20 July 2021, the court continued the 3 August 2021 hearing, per Mother's request, due to a previously scheduled vacation. Father's Motion for Contempt hearing was again rescheduled to 31 August 2021. On 4 August 2021, Mother filed another Motion to Recuse ("Third Motion to Recuse"), citing Father's Attorney's previous representation of Judge McCallum before she was appointed to the bench. Judge McCallum referred Mother's motion to another judge, who heard the matter

on 6 August 2021. Mother's Third Motion to Recuse was denied after that judge concluded the court "was unable to find that objective grounds for disqualification" existed, citing *Lange v. Lange*, 357 N.C. 645, 649, 588 S.E.2d 877, 880 (2003).

On 27 August 2021, Father filed an *Ex Parte* Motion for Emergency Custody Relief. The motion provided:

> Over the past four (4) months, Plaintiff/Mother's behavior and treatment of the minor children has become increasingly violent, erratic, and unstable, culminating in a recent incident, described hereinbelow, in which she hit the parties' daughter, Kate, pulled Kate's hair, took Kate's personal items, choked Kate, and told Kate to "punch me [Plaintiff/Mother] in the face" so that Plaintiff/Mother could call the Department of Social Services ("DSS"), which she has done on multiple occasions in the past. Since the incident, Kate has been in Defendant/Father's exclusive custody, terrified to return to Plaintiff/Mother's residence. Defendant/Father immediately called DSS himself, who, after interviewing Kate, indicated that Kate should be in Defendant/Father's exclusive custody pending further investigation. Although the DSS worker communicated the same to Plaintiff/Mother, Plaintiff/Mother stated that she "expected" Kate home on Friday, August 27 for her regular weekend visitation - in direct contrast with the DSS caseworker's directive.

Judge McCallum granted Father's motion for *ex parte* temporary emergency custody on 30 August 2021.

On 31 August 2021, the third date Father's Motion for Contempt was scheduled for hearing, Mother filed yet another Motion to Recuse ("Fourth Motion to Recuse"). Mother alleged other details regarding Feit's, Father's counsel's, prior professional relationship with Judge McCallum. Judge McCallum denied Mother's

Fourth Motion to Recuse because: Feit had "represented Judge McCallum for a relatively brief period of time, terminating their professional relationship in July 2018 (before Judge McCallum was elected to the bench)[,]" and both Feit and Judge McCallum had followed the North Carolina Judicial Standards Commission's directions regarding when Feit was allowed to appear before her.

Father filed an Amended Notice of Hearing on 1 September 2021 for his Motion for Contempt, Motion to Modify Child Custody, *Ex Parte* Motion for Emergency Custody Relief, Alimony and Attorney's Fees. The hearing was calendared for 16 September 2021.

Mother met with DeCosta on 1 September 2021 for more than seven hours to discuss the case. At some point, Mother also met with another attorney, because she was purportedly dissatisfied with DeCosta's representation.

Father filed a Motion for Sanctions and Motion to Dismiss on 10 September 2021. Mother was required to file a financial affidavit by 7 September 2021 for Father to prepare for the hearing on 16 September 2021 on, among other things, Mother's pending alimony claim. DeCosta emailed Father's attorney on 8 September 2021, asserting she was out of the country on secured leave and would forward the documents upon her return.

Mother fired DeCosta on or around 15 September 2021. DeCosta also filed a Motion to Withdraw from representing Mother on 15 September 2021.

DeCosta attended the virtual hearing on 16 September 2021, per the North

Carolina State Bar's instructions. Both Mother and DeCosta petitioned Judge McCallum for a continuance. Judge McCallum denied Mother's motions to continue given the numerous prior continuances, motions, and petitions filed throughout the duration of this case, but she granted DeCosta's motion to withdraw. She also explained Father's Motion to Modify Post-Separation Support would not be discussed at the hearing because it "wasn't calendared" and Mother did not receive "fair notice that [the motion] was going to happen."

Mother proceeded *pro se* for the 16 September 2021 hearing. Although Mother expressed she was able to defend against Father's motion to modify custody, Mother moved to voluntarily dismiss her own motion to modify custody. Mother expressed she was purportedly unaware she had filed a motion to modify custody on 6 April 2021, which had started this entire series and sequence of current legal proceedings.

Mother called several witnesses to testify on her behalf. Throughout the hearing, Mother repeatedly and vehemently expressed her disdain for and belittled attorney DeCosta. Mother stated on numerous occasions that she had fired DeCosta and asked her to exit and "go off the screen" of the virtual hearing. Mother also repeatedly interrupted Father's counsel.

Judge McCallum granted Father's motion for contempt in an order entered on 2 March 2022, finding Mother guilty of criminal contempt for failing to abide by the terms of the custody order. Mother was ordered to spend thirty days in jail, although her sentence would be suspended if she obtained a mental health evaluation. Judge

McCallum also granted Father's motion for sanctions and motion dismiss and dismissed Mother's alimony claim on 7 March 2022.

An order modifying custody was entered on 25 May 2022. The trial court found "any trust between the parties ha[d] completely deteriorated" since the entry of the 2019 custody order. The trial court found the following findings of fact regarding Mother's repeated frustration of Father's efforts to co-parent the children effectively:

> a. Plaintiff/Mother has exhibited a disconcerting pattern of unstable interpersonal relationships, which the Court finds has a severe, negative impact on the minor children who are at risk of severe emotional distress. Throughout the trial on this matter, Plaintiff/Mother expressed significant disdain and contempt for [any] person that she apparently perceived to be "against" her, including, but not limited to, multiple DSS workers; various lawyers (including her own); the undersigned Judge; the minor children's teachers and coaches; and, most commonly, Defendant/Father. Plaintiff/Mother even expressed that her thirteen (13) year old daughter, Kate, was to blame for a number of the issues and concerns raised to the Court.
>
> b. Plaintiff/Mother has repeatedly made disparaging remarks about Defendant/Father in front of the minor children, including referring to Defendant/Father as a "Jerk," "f[***]ing loser," and [an] "a[**]hole."
>
> c. Plaintiff/Mother's behavior is erratic and unpredictable. When she becomes angry at Defendant/Father or others, she punishes the minor children, showing a willingness to humiliate them in front of their peers and others. The minor children are suffering because of the unpredictability of Plaintiff/Mother's actions. For example:
>> i. Plaintiff/Mother prevented the minor children from traveling on a pre-planned Spring Break trip to Florida with Defendant/Father in April 2021. When Defendant/Father arrived at Plaintiff/Mother's

home to pick the minor children up, the minor children had been locked inside, and Defendant/Father could hear them beating on the door and crying to be let out so that they could go with Defendant/Father. Plaintiff/Mother made comments to the minor children that they would "burn" inside the house.

ii. Plaintiff/Mother has frequently prevented the minor children from attending their extracurricular activities when the minor children are in her care. On one (1) occasion, when Kate was riding to soccer practice with Defendant/Father, Plaintiff/Mother threatened to "call the police" and report that Kate had been "kidnapped." She further threatened to "yank" Kate off of the soccer field in front of her friends and coaches. Plaintiff/Mother[ ] [has] caused Kate to become hysterical, ultimately causing Kate to miss her practice.

iii. Likewise, when Plaintiff/Mother has attended the minor children's extracurricular events, she has actively tried to prevent Defendant/Father from attending same and, on occasions, has caused an excessive, unnecessary scene simply because of Defendant/Father's presence. By way of example, on an occasion where Defendant/Father attended [ ] two (2) of the minor children's basketball games (happening at the same time and location), Plaintiff/Mother attempted to have Defendant/Father removed from the premises because of a policy related to the COVID-19 pandemic under which the league only allowed (1) parent to attend games. When Plaintiff/Mother learned that, because of low attendance, the league would allow both she <u>and</u> Defendant/Father to attend the minor children's games, she wrote to multiple of the league officials, accusing them of "sexism."

d. Multiple witnesses described incidents in which the

minor children were present, and Plaintiff/Mother displayed a complete lack of judgment regarding the safety and welfare of the minor children.

> i. Following the election of Joe Biden in November 20[20], Plaintiff/Mother became offended by a comment made by one of Chris's friends. Plaintiff/Mother responded by telling the child in the presence of her own minor children that he had "no friends;" by calling him names, including a "little shit;" and by confiscating and keeping the child's cell phone. Bizarrely, Plaintiff/Mother brought this child's mother, Karin Simoneau (hereinafter "Ms, Simoneau") in to testify on her behalf. Ms. Simoneau testified that her son was so afraid of Plaintiff/Mother after the Incident that her husband had to go to Plaintiff/Mother's home to retrieve their son's cell phone on their son's behalf. Throughout her own and Ms. Simoneau's testimony, Plaintiff/Mother completely failed to recognize any problem with her own behavior (directed at a child) and, instead, blamed said child for "provoking" her.

> ii. Plaintiff/Mother has destroyed the minor children's electronic devices as a means of punishment on multiple occasions in the minor children's presence by throwing them, cracking them, and hitting them until they shatter. It is not in the minor children's best interests to witness such violent outbursts.

e. Plaintiff/Mother's choices and actions are largely focused on her anger toward and disdain for Defendant/Father, and she fails entirely to recognize how her actions have a negative impact on her children. For example:

> i. As mentioned above, Plaintiff/Mother has arbitrarily kept the minor children from attending their extracurricular activities on a number of occasions without any justification or reasoning. At the end of Kate's soccer season, Plaintiff/Mother refused to allow Kate to attend a tournament with her team in which all of the teammates stayed

together in a hotel and that acted as an end of the season celebration. Although Defendant/Father both offered to take Kate to the tournament <u>and</u> to pay for lodging for Plaintiff/Mother to take Kate to the tournament, Plaintiff/Mother refused to allow Kate to attend. Plaintiff/Mother seemed to have no understanding or acknowledgement of the minor children's feelings related to arbitrary feelings like this one.

ii. Plaintiff/Mother regularly interferes in the minor children's ability to communicate with Defendant/Father when the children are in her care. She frequently takes the children's electronic devices, requiring Defendant/Father to go through Plaintiff/Mother in order to speak to the children, which often involves Plaintiff/Mother verbally berating and/or disparaging Defendant/Father in the minor children's presence. On at least one occasion, Plaintiff/Mother has even unplugged the landline so that the children and Defendant/Father had no way of contacting one another.

iii. Plaintiff/Mother has, on numerous occasions, intentionally interfered in Defendant/Father's time and plans with the minor children. In addition to interference in the Florida spring break trip, described hereinabove, Plaintiff/Mother also interfered in Defendant/Father's summer vacation to Boston with the minor children. When Defendant/Father told Plaintiff/Mother that he needed to pick the minor children up at a specific time to make their flight to Boston, Plaintiff/Mother chose to arbitrarily withhold the children until later in the afternoon, causing the family to miss their original flight.

The trial court also made several findings regarding the ways Mother "presents danger to the minor children's physical and emotional well-being":

i. On Wednesday, August 25, 2021, the parties' daughter, Kate, began to frantically text Defendant/Father regarding one of Plaintiff/Mother's outbursts, stating that Plaintiff/Mother was "going crazy," "attacking [Kate]," and "throwing my stuff away." Kate further stated "shes (sic) hurting me and I cant (sic) do this anymore she grabbed my throat multiple times and tried to choke me." Defendant/Father immediately drove to Plaintiff/Mother's home, where Kate was standing in the front yard, crying hysterically. As Defendant/Father pulled up, Kate ran to Defendant/Father's car. Defendant/Father learned that Plaintiff/Mother had hit Kate, pulled Kate's hair, took Kate's personal items, choked Kate, and told Kate to "punch me [Plaintiff/Mother] in the face" so that Plaintiff/Mother could call DSS. She further told Kate, as she has on numerous occasions in the past, that Kate is no longer welcome to live in her home and that she should go live with Defendant/Father.

ii. The repeated involvement of DSS is not in the minor children's best interests. The DSS caseworker, Elisa Guarda ("Ms. Guarda"), testified related to her concerns about Kate's well-being specifically, including that Kate expressed that she had to "walk on eggshells" around Plaintiff/Mother. She also expressed concern about the shocking nature of Kate's allegations of Plaintiff/Mother's physical violence.

iii. Plaintiff/Mother has historically focused her anger on one of the minor children at a time, often encouraging the other three (3) children to "gang up" on the child who is currently the object of her ire. Plaintiff/Mother has encouraged her three (3) sons to bully their sister, including allowing, and even encouraging, the three (3) boys to call their sister "fat."

iv. On other occasions, Plaintiff/Mother has told whichever child is her current focus that they are "no longer welcome" in Plaintiff/Mother's home. Since the entry of the 2019 Order, she has, on numerous occasions, dropped one (1) or more of the minor children off at Defendant/Father's house

unannounced, stating that that child (or children) are no longer welcome to live with her. She has stated that she will "sign" the children over to Defendant/Father when she becomes angry at the children, including in the presence of one or all of the children.

v. Plaintiff/Mother's emotional outbursts have led her to behave recklessly in front of the minor children. Plaintiff/Mother has waved a gun around while "fake" bullets fall out. Likewise, Plaintiff/Mother has repeatedly destroyed the minor children's property – in the minor children's presence – including smashing at least three (3) iPads by throwing them violently to the ground.

vi. Plaintiff/Mother has resorted to physical discipline in the past, including, beating the minor children with a wooden spoon and digging her nails into the minor children until she draws blood.

The trial court concluded "[a] substantial change in circumstances affecting the best interests of the minor children ha[d] occurred" to warrant a modification of the 2019 Custody order. The court changed the visitation schedule between Mother and Father. Mother was awarded visitation with Chris, Daniel, and Michael every other weekend from Friday evening until Monday morning, as well as dinner each Wednesday evening. Mother was awarded a FaceTime phone call once each evening. The schedule regarding holidays and school-year breaks remained unchanged and were evenly divided between Mother and Father. The only change in the holidays and school-year breaks schedule was that "Kate [was] allowed, but not required, to follow" the schedule.

Mother filed a timely notice of appeal regarding the custody order on 23 June

2022. Mother's notice of appeal regarding the trial court's denial of two of her motions to recuse, both entered on 21 October 2021, were not timely made, are not properly before us, and are dismissed.

## II. Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b)(2) (2021).

## III. Issues

Mother argues: (1) the trial court abused its discretion by denying Mother's motion to continue the 16 September 2021 hearing; (2) erred by not allowing Mother additional time to present her case or rebuttal evidence; (3) the trial court's findings of fact are not supported by the evidence; (4) the trial court erred by determining a substantial change of circumstances had occurred affecting the welfare of the children; and, (5) the trial court abused its discretion by determining the children's best interests were served by placing them in Father's primary custody.

## IV. Motion to Continue & Duration of Hearing

Mother argues the trial court abused its discretion by denying her motion to continue and asserts the trial court's failure to allow her motion to continue "denied her [of her] constitutional right to parent her children." She also argues the trial court abused its discretion by limiting each side to two-and-a-half hours to present evidence.

### A. Standard of Review

"Ordinarily, a motion to continue is addressed to the discretion of the trial

court, and absent a gross abuse of that discretion, the trial court's ruling is not subject to review." *In re A.L.S.*, 374 N.C. 515, 516-17, 843 S.E.2d 89, 91 (2020) (quoting *State v. Walls*, 342 N.C. 1, 24, 463 S.E.2d 738, 748 (1995)).

When the motion to continue is based on a constitutional right *and asserted before the trial court,* "the motion presents a question of law[,] and the order of the court is reviewable." *Id.* at 517, 843 S.E.2d at 91 (quoting *State v. Baldwin*, 276 N.C. 690, 698, 174 S.E.2d 526, 531 (1970)). If the movant failed to "assert in the trial court that a continuance was necessary to protect a constitutional right," then the unpreserved constitutional argument is waived, and the appellate court "review[s] the court's ruling on the motion to continue for abuse of discretion." *In re A.M.C.*, 381 N.C. 719, 722-23, 874 S.E.2d 493, 496 (2022) (citations and internal quotation marks omitted).

## B. Analysis

Mother cites *Pickard Roofing Co., Inc. v. Barbour* to support her argument that the trial court abused its discretion by failing to continue the hearing due to DeCosta's withdrawal. 94 N.C. App. 688, 381 S.E.2d 341 (1989). Father asserts Mother's reliance on *Pickard Roofing* defeats her claim. In *Pickard Roofing,* the counsel's decision to withdraw "was necessitated by the party's decision to terminate his employment one day before the day on which the party knew his case was scheduled to be tried." *Id.* at 692, 381 S.E.2d at 343.

This Court held the trial court did not abuse its discretion by finding: the

defendant "should have made a decision with respect to representation by counsel prior to the eve of trial," and "[n]o circumstances beyond the control of the defendant ha[d] prevented him from appearing in court with an attorney of his choice." *Id.* at 691, 381 S.E.2d at 343.

Similar to the defendant in *Pickard Roofing*, Mother has "overemphasize[d] the fact that h[er] attorney was allowed to withdraw the day before the trial was scheduled to commence[,]" and "simultaneously de-emphasize[d] the reason why the attorney withdrew, because [Mother] terminated h[er] employment." *Id.* at 692, 381 S.E.2d at 343.

The trial court did not abuse its discretion by denying the oral motion on the prior-noticed and scheduled date of the hearing to continue the hearing. *Id.  See also Chris v. Hill*, 45 N.C. App. 287, 290, 262 S.E.2d 716, 718 (1980) ("[A] party to a lawsuit must give it the attention a prudent man gives to his important business." (citations omitted)); *Wayne v. Jones*, 79 N.C. App. 474, 475, 339 S.E.2d 435, 436 (1986) ("The defendant received reasonable notice of his attorney's withdrawal as evidenced by the defendant's statement in court that he did not want a lawyer."); *McIntosh v. McIntosh*, 184 N.C. App. 697, 702, 646 S.E.2d 820, 824 (2007) (finding no abuse of discretion in trial court's denial of a motion for continuance "[i]n light of the numerous and lengthy delays in hearing th[e] case").  Mother's argument is without merit.

Mother failed to argue the trial court's denial of her motion to continue denied her the constitutional right to parent her children.  Mother's purported constitutional

arguments on appeal are waived and dismissed. *In re A.M.C.,* 381 N.C. at 722-23, 874 S.E.2d at 496.

Mother was fully aware of the time constraints the court established. The trial court explained at the beginning of the trial that the duration was set for five hours, divided evenly between the two parties. Mother was also aware she needed to track her time. Mother asked the trial court: "And Ms. – I mean, Your Honor, as far as time goes, how are we doing time?· Is this, like, my time, and I need to start putting down the time that I start speaking?"

The trial court also addressed how long each party should take for lunch to make sure each side had an equal amount of time to present their case.

> MR. FEIT:· And Your Honor, just before Ms. Conroy asks a question, we've got until five o'clock, from a budgeting time perspective. What time would you like to break?· What time would you like to come back, so we can all make sure that we have the – equal, same amount of time.
>
> THE COURT: All right. Do we want to do an hour for lunch, or half hour?
>
> MR. FEIT:· Half hour's fine –
>
> MS. CONROY:· Half hour's fine with me.

Furthermore, while Mother only left five minutes for her closing arguments, the trial court and Feit allowed Mother to give a twenty-minute closing argument. Mother's argument is without merit. *See Watters v. Parrish,* 252 N.C. 787, 791, 115 S.E.2d 1, 4 (1960) ("[T]here is power inherent in every court to control the disposition

of causes on its docket with economy of time and effort for itself, for counsel, and for litigants." (citation omitted)).

## V.     Findings of Fact

Mother argues several of the court's findings of fact are not supported by the evidence, including the findings that: Mother had "disdain and contempt for any person that she apparently perceived to be 'against' her," including her lawyer, Father's lawyer, Judge McCallum, multiple DSS workers, and the children's teachers and coaches; the children were "beating on the door and crying" to travel for spring break with Father, and Mother said she would let them "burn"; Mother behaved erratically; Mother was "oblivious" to the consequences of her actions; Mother failed to recognize her own "poor decision-making" and "blamed others," including Kate; Mother wrote to multiple league officials saying they were "sexist" when Father was allowed to attend the children's games; Mother displayed a "complete lack of judgment" for the "safety and welfare" of the children, including the incident with her child's friend about Joe Biden following the 2020 election; and, the DSS worker's concerns about Kate's "well-being" and her shock regarding Mother's "physical violence" towards Kate.

### A.  Standard of Review

> When reviewing a trial court's decision to grant or deny a motion for the modification of an existing child custody order, the appellate courts must examine the trial court's findings of fact to determine whether they are supported by substantial evidence.   Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Shipman v. Shipman*, 357 N.C. 471, 474, 586 S.E.2d 250, 253 (2003) (citations and internal quotation marks omitted).

The trial court is vested with broad discretion over the admission of and credibility accorded to evidence, because the court has the opportunity to hear and observe the witnesses and to assess credibility. *Id.*; *Pulliam v. Smith*, 348 N.C. 616, 624, 501 S.E.2d 898, 902 (1998). "As a result, we have held that the trial court's 'findings of fact have the force and effect of a verdict by a jury and are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary.'" *Pulliam*, 348 N.C. at 625, 501 S.E.2d at 903 (quoting *Williams v. Pilot Life Ins. Co.*, 288 N.C. 338, 342, 218 S.E.2d 368, 371 (1975)).

Unobjected-to findings of fact are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) ("Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." (citations omitted)). When a challenged finding of fact is not necessary to support a trial court's conclusions, those findings "need not be reviewed on appeal." *See In re C.J.*, 373 N.C. 260, 262, 837 S.E.2d 859, 860 (2020) (citation omitted).

## B. Analysis

Here, substantial evidence, through properly admitted testimony and other

evidence in the record, exists to support each of the legally relevant and necessary findings of fact Mother challenges on appeal. *Shipman*, 357 N.C. at 474, 586 S.E.2d at 253. We need not review those portions of the findings of fact unnecessary to support the trial court's conclusions, such as specific evidence of the kids crying and banging on the door to leave with Father on spring break. *In re C.J.*, 373 N.C. at 262, 837 S.E.2d at 860. Mother's argument is without merit.

## VI.    Substantial Change & Custody Determination

Mother asserts the trial court erred by determining a substantial change of circumstances had occurred affecting the welfare of the children. Mother argues the trial court erred by finding her behavior constituted a substantial change because: she has always had "poor interpersonal relationships[,]" her "overall behavior" towards Father has been erratic and unpredictable for years, and she has often "ma[de] disparaging remarks about [Father] while the children were present[.]"

Although Mother concedes those alleged behaviors may have made the trial court "unhappy," she asserts all of the behaviors contained in the modification order "existed at the time of the original trial" in 2019. Mother argues those findings of fact cannot serve as a basis for a "substantial change" of circumstances.

Mother also argues the trial court abused its discretion by placing the children in Father's primary custody. If this Court holds a substantial change occurred to warrant a modification of the 2019 Custody Order, she argues the trial court failed to determine how any purported changes affected the welfare of the children.

## A. Standard of Review

Wide discretion is vested in the trial judge when awarding primary custody of a minor child. *Shamel v. Shamel*, 16 N.C. App. 65, 66, 190 S.E.2d 856, 857 (1972). "It is well established that where matters are left to the discretion of the trial court, appellate review is limited to a determination of whether there was a clear abuse of discretion." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985). "A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason[,]" or has misapprehended and committed an error of law. *Id.*

A trial court may not modify a permanent child custody order unless it finds a substantial change in circumstances exists affecting the welfare of the child. *Simmons v. Arriola*, 160 N.C. App. 671, 674, 586 S.E.2d 809, 811 (2003). Whether a substantial change in circumstances exists for the purpose of modifying a child custody order is a legal conclusion. *Spoon v. Spoon*, 233 N.C. App. 38, 43, 755 S.E.2d 66, 70 (2014). "Conclusions of law are reviewed de novo and are subject to full review." *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011) (citations omitted).

## B. Analysis

"A trial court may order the modification of an existing child custody order if the court determines that there has been a substantial change of circumstances affecting the child's welfare and that modification is in the child's best interests."

*Spoon*, 233 N.C. App. at 41, 755 S.E.2d at 69 (citing *Shipman*, 357 N.C. at 473, 586 S.E.2d at 253); N.C. Gen. Stat. § 50–13.7 (2021). The reason a substantial change of circumstances is required before a trial court may modify a custody order is to prevent dissatisfied parties from relitigating in another court in hopes of reaching a different conclusion. *Newsome v. Newsome*, 42 N.C. App. 416, 425, 256 S.E.2d 849, 854 (1979).

### 1. Substantial Change

This Court has previously addressed whether two parents' poor communications with and maltreatment of one another constitutes a substantial change in circumstances, notwithstanding the parents' prior longstanding history of conflicts and poor communication with one another:

> It is beyond obvious that a parent's unwillingness or inability to communicate in a reasonable manner with the other parent regarding their child's needs may adversely affect a child, and the trial court's findings abundantly demonstrate these communication problems *and* the child's resulting anxiety from her father's actions. While father is correct that this case overall demonstrates a woeful refusal or inability of both parties to communicate with one another as reasonable adults on many occasions, we can find no reason to question the trial court's finding that these communication problems are *presently* having a negative impact on Reagan's welfare that constitutes a change of circumstances. In fact, it is foreseeable the communication problems are likely to affect Reagan more and more as she becomes older and is engaged in more activities which require parental cooperation and as she is more aware of the conflict between her parents. Therefore, we conclude that the binding findings of fact support the conclusion that there was a substantial change of circumstances justifying modification of custody. This argument is overruled.

*Laprade v. Barry*, 253 N.C. App. 296, 303-04, 800 S.E.2d 112, 117 (2017) (citing *Shipman*, 357 N.C. at 473-75, 586 S.E.2d at 253-54). *See also Shell v. Shell*, 261 N.C. App. 30, 36-38, 819 S.E.2d 566, 572-73 (2018) (citing *id.*).

The facts before us are similar to those in *Laprade*. While Mother and Father have always had conflicts and struggled to communicate effectively, those "communication problems are *presently* having a negative impact on [the four children's] welfare that constitutes a change of circumstances." *Laprade*, 253 N.C. App. at 304, 800 S.E.2d at 117 (citation omitted).

It is also "foreseeable" that Mother's and Father's inability to communicate and cooperate as parents of minor children are "likely to affect" Daniel, Michael, Christopher, and Kate "more and more as [the children] become[ ] older and [are] engaged in more activities which require parental cooperation and as [they become] more aware of the conflict between [their] parents." *Id.*

The trial court did not err by determining Mother's and Father's continued communication problems and their failure or inability to cooperate and co-parent constituted a substantial change. *Id.*; *Shell*, 261 N.C. App. at 36-38, 819 S.E.2d at 572-73. Mother's argument is overruled.

### 2. *Custody Determination*

If a trial court fails to determine whether a change "positively or negatively" affected the child, the custody matter must be remanded to the trial court to

determine whether the changes affected the child and, if so, what custody determination is in the child's best interest. *Johnson v. Adolf*, 149 N.C. App. 876, 878, 561 S.E.2d 588, 589 (2002) (citing *Pulliam*, 348 N.C. at 620, 501 S.E.2d at 900).

Here, the trial court made specific findings of fact regarding how Mother's current and more aggressive behaviors had affected the "physical and emotional stability and well-being" of the children and provided a six-part list with specific examples of findings. The trial court also concluded "[a] substantial change in circumstances affecting the best interests of the minor children ha[d] occurred[.]"

The trial court made the necessary and supported findings of fact to find a substantial change of circumstances had occurred and the conclusions of law to warrant a modification of the 2019 Custody Order. The trial court did not abuse its "best interests" discretion by awarding primary custody of the children to Father. *See id.*; *Shamel*, 16 N.C. App. at 66, 190 S.E.2d at 857; *White*, 312 N.C. at 777, 324 S.E.2d at 833. Mother's argument is overruled.

## VII. Conclusion

Mother's failure to raise her constitutional parental rights arguments before the trial court on her motions to continue waived her argument on appeal.

Mother's challenge to the trial court's discretionary denial of her untimely and unsupported motion to continue lacks merit. Her actions to undermine and terminate her counsel's representation supports the court's allowance of her counsel's motion to withdraw. Mother had prior notice of the trial court's allowance of five (5) hours for

the parties to equally present their evidence and arguments. She was granted additional time to present her closing arguments within the discretion of the trial court.

The evidence supports and the trial court made the necessary findings of fact of a substantial change of circumstances to warrant a conclusion to modify the 2019 Custody Order in the best interests of the minor children. The order appealed from is affirmed. *It is so ordered.*

AFFIRMED.

Judge HAMPSON and Judge CARPENTER concur.